ACCEPTED
12-15-00189-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
11/9/2015 2:58:15 PM
Pam Estes
CLERK

CAUSE No. 12-15-00189-CV

IN THE COURT OF APPEALS OF TEXAS
FOR THE TWELFTH CIRCUIT
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
11/9/2015 2:58:15 PM
PAM ESTES
Clerk

*GARRISON NURSING HOME AND REHABILITATION CENTER AND
GARRISON NURSING HOME, INC.,*
Appellant

v.

*LEGATHA DEMINGS,*
Appellee

On Appeal From Cause No.
In the 145th Judicial District Court of Nacogdoches County, Texas

## APPELLEE'S BRIEF

LAW OFFICE OF STEPHEN SHIRES, PLLC
Attorney & Counselor at Law

W. Stephen Shires
State Bar No. 50511894
123 San Augustine Street
P.O. Box 2224
Center, Texas 75935
(936) 598-3052 (Phone)
(936) 598-3031 (Facsimile)
stephen@shireslawfirm.com
**ATTORNEY FOR LEGATHA DEMINGS**

**ORAL ARGUMENT REQUESTED IF GRANTED TO APPELLANT**

# IDENTITY OF PARTIES AND COUNSEL

In accordance with TEX. R. APP. P. 38.1(a), the following is a list of the parties to this action, their respective counsel, and the presiding judge at trial:

Appellants:                          Garrison Nursing Home and
                                     Rehabilitation Center and Garrison
                                     Nursing Home, Inc. **("GNH")**

Trial and Appellate Counsel:         David W. Frost
                                     Kent, Anderson, Bush, Frost, and Metcalf, P.C.
                                     1121 E.S.E Loop 323, Suite 200
                                     Tyler, Texas 75701
                                     (903) 579-7500 (phone)
                                     (903) 581-3701 (facsimile)
                                     dfrost@tyler.net

Appellee:                            Legatha Demings **("Demings")**

Trial and Appellate Counsel:         Stephen Shires
                                     Law Office of Stephen Shires, PLLC
                                     123 San Augustine Street
                                     P.O. Box 2224
                                     Center, Texas 75935
                                     (936) 598-3052 (phone)
                                     (936) 598-3031 (facsimile)
                                     stephen@shireslawfirm.com

Trial Judge:                         Honorable Campbell Cox II
                                     145th Judicial Court, Nacogdoches, Texas

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................ ii

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT............................................1

STATEMENT OF ISSUES.................................................................................1

STATEMENT OF THE CASE............................................................................1

STANDARD OF REVIEW ................................................................................1

STATEMENT OF FACTS .................................................................................2

SUMMARY OF THE ARGUMENT ..................................................................3

ARGUMENT .....................................................................................................4

    A. **GNH improperly seeks a technical dismissal of claims that clearly have merit.**
         ............................................................................................................5

    B. **Dr. Miller is qualified to address causation in this case.**
         ............................................................................................................7

    C. **The reports do not simply provide conclusory statements on causation.**
         ........................................................................................................... 11

    D. **Alternatively, this is a matter of *res ipsa loquitur.***
         ........................................................................................................... 17

CONCLUSION AND PRAYER ....................................................................... 18

CERTIFICATE OF SERVICE ........................................................................ 19

CERTIFICATE OF COMPLIANCE ................................................................ 19

INDEX OF APPENDIX .................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Am. Transitional Care Ctrs. Of Texas, Inc. v. Palacios,* 46 S.W.3d 873 (Tex. 2001) ............................................................................... 2, 4

*Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002) ...................... 6

*Broders v. Heise,* 924 S.W.2d 148 (Tex. 1996) .................................... 7

*Collini v. Pustejovsky,* 280 S.W.3d 456 (Tex. App. Fort Worth 2009, no pet) ......................................................................... 11

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ........ 10

*Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238 (Tex. 1985) ......... 2

*Gammill v.Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713 (Tex. 1998) ..... 10

*Haddock v. Arnspiger,* 793 S.W.2d 948, 950 (Tex. 1990) ................. 17, 18

*Hall v. Huff,* 957 S.W.2d 90 (Tex. App. – Texarkana 1997, pet. denied) ...... 7

*HEB Grocery Co. v. Galloway,* 2014 WL 2152128 (Tex. App. – Beaumont 2014, not pet) ..................................................................... 11

*Kunho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) ........................ 10

*Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572 (Tex. 2006) ................... 10

*Nenno v. State,* 970 S.W.2d 549 (Tex. Crim. App. 1998) ................... 10

*Ross v. St. Luke's Episcopal Hospital,* 462 S.W.3d 496 (Tex. 2015)........... 5

*Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex. 2011) ..................... 6

*Scoresby v. Santillan,* 346 S.W.3d 546 (Tex. 2011)......................... 5

*Van Ness v. ETMC First Physicians,* 461 S.W.3d 140 (Tex. 2015) .................................................................... 1, 4, 5, 6, 16, 17

## STATUTES AND RULES

TEX. CIV. PRACT. & REM. CODE Ann. §74.001 ............................... 3

TEX. CIV. PRACT. & REM. CODE Ann. §74.201 (Jones McClure 2015) ........ 17

TEX. CIV. PRACT. & REM. CODE Ann. §74.351 (Jones McClure 2015) ...... 1, 5

TEX. CIV. PRACT. & REM. CODE Ann. §74.403 (Jones McClure 2015) .......... 7

## STATEMENT REGARDING ORAL ARGUMENT

GNH requested oral argument in this case. In the event that the Court grants GNH's request, then Demings also requests oral argument in this matter.

## STATEMENT OF ISSUES

GNH has raised the following two issues:

1. Whether the trial court abused its discretion in overruling GNH's objections to Demings' supplemental expert report from Dr. Keith E. Miller for the failure to show he was qualified to provide opinions regarding the element of causation and denying GNH's motion to dismiss pursuant to TEX. CIV. PRACT. & REM. CODE Ann. §74.351 (Jones McClure 2015).

2. Whether the trial court abused its discretion in overruling GNH's objections to Demings' supplemental expert report from Dr. Keith E. Miller for failure to adequately address the element of causation and denying GNH's motion to dismiss pursuant to TEX. CIV. PRACT. & REM. CODE Ann. §74.351 (Jones McClure 2015).

## STATEMENT OF THE CASE

GNH accurately stated the Statement of the Case in this matter. Demings would only add that the Supplemental Miller Report filed by Demings in this matter (CR 50) was expressly incorporated by reference into the previous Kaper Report (CR 25), and vice-versa. In other words, the two reports are to be construed together, as if one report, along with all the information contained in both reports.

## STANDARD OF REVIEW

Demings agrees that the Standard of Review in this matter is abuse of discretion. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex.

1

2015); *Am. Transitional Care Ctrs. Of Texas, Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex. 2001). Demings further agrees that a trial court abuses its discretion only when it acts in an arbitrary or unreasonable manner without regard to any guiding rules or principals. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

## STATEMENT OF FACTS

This case arises out of, *among various breaches of duty*, the complete failure of GNH to administer the medication Xarelto to Demings despite a prescription from her treating physician for that medication. (CR 25, 50). Demings had been diagnosed with atrial fibrillation and previously suffered a mild ischemic cardiovascular accident. (CR 55). As a result, her physician, Dr. Dennis Calhoun, had prescribed Xarelto, to be taken by Demings as a measure to prevent her from suffering another and possibly greater and much more severe stroke. (CR 55). To be clear – the purpose for Demings taking the Xarelto in this case was solely to prevent her from suffering another stroke resulting from her atrial fibrillation. (CR 25, 50). GNH's own report admits that GNH failed to provide the Xarelto to Demings due to an "error in the transcription of [the] order." (CR 64). Demings then actually suffered a severe stroke, and, prior to transferring Demings to the hospital, the charge nurse at GNH, after talking to a doctor, that the medication had erroneously been omitted from the MAR. (CR 55, 57, 64). As a

2

result, Demings has sued GNH for negligence, alleging that GNH, among other things:

- breached their duty to provide her with necessary supervision;

- breached their duty to use reasonable care in treating her with the degree of skill and learning ordinarily possessed and used by nursing home facilities East Texas;

- breached their duty to assist her in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being;

- breached their duty to make sure that she received all of her medications timely and in the appropriate doses – namely the prescribed Xarelto;

- breached their duty to make sure that her' prescription(s) and/or orders were accurately transcribed by the nursing home staff onto her charts/records/orders and to properly send her prescription to be filled by the pharmacy – namely failing to include Xarelto as one of the medications for the pharmacy to fill; and

- breached their duty to have a system in place that insures the accuracy of the transcription of her prescription order.

## SUMMARY OF THE ARGUMENT

The trial court did not abuse its discretion in this case. The reports submitted by Demings meet the requirements of TEX. CIV. PRACT. & REM. CODE Ann. §74.001 *et. seq.* (Jones McClure 2015) (hereinafter the "Medical Liability Act"). The reports provide more than adequate information to: (i.) inform GNH of the specific conduct that Demings has called into question, and (ii.) provide a basis for the trial court to conclude that her claims have sufficient merit for the case to proceed in the litigation. GNH seems to interpret the Medical Liability Act to

require Demings to provide a level of proof that is more attributable to what is expected at the final trial of this matter. Such is improper. Given the nature of this case, Dr. Miller's credentials are more than sufficient to demonstrate that he is qualified to render an opinion on causation in this matter. Further, the information provided in the reports on causation makes them not merely "conclusory." The reports provide reasoned analysis on the matter that provides a basis for causation. Should this Court disturb the trial court's decision in this case, such would be erroneous. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140 (Tex. 2015). Finally, Demings argues in the alternative that the doctrine of *res ipsa loquitor* excuses the requirement of demonstrating causation in this case.

## ARGUMENT

GNH argues that the reports proffered by Demings are deficient under the standards set forth by the Medical Liability Act, as interpreted by *Am. Transitional Care Ctrs. Of Texas, Inc. v. Palacios,* 46 S.W.3d 873 (Tex. 2001). Originally, GNH argued that there was a problem with the causation portion of the report proffered by Pauline Kaper, R.N. ("Kaper") because she is not a physician. Demings remedied that issue by supplementing that report with the report of Keith Miller, M.D., who is clearly a physician. The report of Dr. Miller, which was supplemental to the Kaper report, addresses and reinforces the standards of care, breaches of the standard, and the causation in this case, as originally set forth in the

4

Kaper report. Read together, the original report of Kaper and the supplemental report of Miller fulfill the obligations required by the Medical Liability Act. For this reason, this Court should affirm the order of the trial court in this matter.

**A. GNH improperly seeks a technical dismissal of claims that clearly have merit.**

The purpose of the Medical Liability Act's expert report requirement is not to have claims dismissed regardless of their merits, but rather it is to identify and deter frivolous claims while not unduly restricting a claimant's rights. *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496, 502 (Tex. 2015); *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). A plaintiff asserting a health care liability claim must serve each defendant with an expert report that includes a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damage claimed." *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 141(Tex. 2015) (quoting TEX. CIV. PRACT. & REM. CODE Ann. §74.351(r)(6) (Jones McClure 2015)). A challenge to the sufficiency of a report will only be sustained if "the report does not represent an objective good faith effort to comply with the [statutory requirements]." *Id.* The report constitutes a good faith effort if it provides adequate information to inform the defendant of the specific conduct the plaintiff has called into question, provide[s] a basis for the

5

trial court to conclude that the claims have merit, and does not contain a material deficiency. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011). The reports proffered by Demings clearly meet these standards. As stated above, the purpose of the expert report requirement is not to have claims dismissed regardless of their merit, but rather to identify and deter frivolous claims. In the very least the proffered reports demonstrate that Demings claims rise above the level of frivolous. The purpose of the report is not to fully and finally litigate the merits of the case, but rather to provide a mechanism to make sure the case is not being brought to harass the defendant.

As such, GNH was attempting to abuse a process, designed to merely insure that a claim being brought is *bona fide*, in order to cause a claim with clear merit to be summarily dismissed. Such was wholly improper.

In this case, the trial court found that Demings fulfilled the requirements of the Medical Liability Act. The trial court acted within its discretion in overruling GNH's objections and denying its motion to dismiss the case. To upset the trial court's decision in this matter would be improper, just as it was in *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140 (Tex. 2015). (Appendix C). In that case, the Texas Supreme Court reversed this Court's decision reversing the trial court's

decision to deny ETMC's motion to dismiss case on virtually the same grounds and for the same reasons proffered by GNH in this matter.

**B. Dr. Miller is qualified to address causation in this case.**

In order to provide testimony on causation, the expert must (i.) be a physician, and (ii) be qualified to give an opinion under the Texas Rules of evidence. TEX. CIV. PRACT. & REM. CODE Ann. §74.403 (a)-(c) (Jones McClure 2015). The expert simply must demonstrate that he has knowledge about the specific issue that he is testifying about and that he meets the requirements of Texas Rule of Evidence 702 regarding the issue. *Broders v. Heise,* 924 S.W.2d 148, 152-153 (Tex. 1996). Put another way, the expert only has to demonstrate that the subject is common to and developed in his or her field or practice. *Id.*; *Hall v. Huff,* 957 S.W.2d 90, 100 (Tex. App. – Texarkana 1997, pet. denied). In this case, Dr. Miller unequivocally states that he has familiarity with the standard of care (and the related assessment of causation) for the treatment of patients with strokes, hypertension, and related illnesses, and with conditions similar to those experienced by Demings:

> At the time of the care and treatment of Ms. Legatha Demings by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, form May 2012 through June 2012, I was familiar with the minimum medical standards of care applicable to the assessment, diagnosis and treatment of patients with strokes, hypertension, and related illnesses, as well as their complications and other medical conditions similar to those experienced by Ms. Legatha Demings and described in the referenced medical records.

7

I am familiar with the medical and nursing standards of care for the above referenced conditions applicable to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas. The minimum standards of care for treatment of patients with similar signs, symptoms and conditions as Ms. Legatha Demings that are the basis of this report, are national standards of care and do not differ from community to community.

From the time of the medical treatment of Ms. Legatha Demings from May 2012 through June 2012, and through the present, I have had an active clinical practice as a family practitioner in Center, Texas that includes providing care to adult patients in nursing homes and rehabilitation centers, such as Ms. Legatha Demings. During my career as a family practitioner, I have worked with and or supervised medical office staff, hospital staff, cursing home staff, and rehabilitation center staff, inducing medical technologists and nurses, in the care of my patients. I have also participated in the development and use of protocols, policies and procedures for the care of patients with strokes, hypertension and related illnesses, as well as their causes and complications, including adults such as Ms. Legatha Demings.

In addition, based on my education, training knowledge and direct experience, I am familiar with the accepted and expected standards of care, as listed below, for nursing home and rehabilitation center facilities who take care of patients with conditions such as strokes, hypertension, related illnesses, and their complications, and can offer opinions on the standards of care, the breaches of the standards of care and the causation of the injuries from these breaches.

In my medical practice, I routinely rely on medical records, nursing records, lab reports, diagnostic tests and images, consulting physician reports and other patient data. I consider materials of this type to be generally reliable, unless evidenced otherwise, and they are the type of materials routinely relied upon by physicians and clinical staff in providing care to patients.

*See* Report of Dr. Miller, pp 5-6 (CR 50) (Appendix B). Without a doubt, the

prescription of a regime of blood thinner is clearly with the scope of Dr. Miller's

8

practice as a physician that deals with patients that are stroke victims and patients that reside in nursing homes. It is clearly within the scope of his expertise, then, to testify about the effect of failing to take the prescribed regime of the blood thinner. Moreover, Dr. Miller goes on to state additional information concerning his "case specific expertise," that further demonstrates his expertise in treating patients in nursing homes, expressly including patients that suffer from the "same or similar" conditions Demings, including illnesses related to strokes, hypertension, and related illnesses, gained through:

1) His attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications.

2) Practical experience of diagnosing and treating patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

3) Discussions with colleagues at yearly conferences, seminars and meetings;

4) Study of technical works routinely published in textbooks, journals and literature concerning the evaluations, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

5) My routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

9

6) His routine and regular contact with nursing home nurses, staff and residents who take care of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

7) His knowledge and experience giving lectures and in-service conferences to the nurses and staff;

8) His experience service on numerous hospital and nursing home committees; and

9) His observation of nurses and nurse conduct, supervising residents and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications.

*Id.* at pp. 6-7. Without a doubt, Dr. Miller provides sufficient information to meet the requirements for reliability under the applicable standards for Texas Rules of Evidence 702 and 703. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kunho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572 (Tex. 2006); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex. 1998); *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998). As a practical matter, it would be virtually impossible to locate and retain a practicing physician who could truthfully state that he has specifically studied the specific effects of or had specific training concerning the specific drug Xarelto, as GNH asserts is required in this case. That is not required by the Medical Liability Act. Instead, Dr. Miller has provided more than sufficient

10

information that would qualify him to testify under Texas Rules of Evidence 702 and 703 on this issue, which is what is required. In this case, Dr. Miller provided sufficient information that he has experience in treating patients in nursing homes[1] and treating patients that have suffered strokes, which would necessarily include the medications associated with the treatment of the condition. Dr. Miller's report contains a long recitation of his experience and qualifications in dealing with stroke victims and nursing home patients. For this reason, the cases cited by GNH on this issue are inapposite,[2] and GNH's argument on this point is simply not persuasive.

## C. The reports do not simply provide conclusory statements on causation.

Dr. Miller provides a seventeen (17) page, single spaced report. He devotes four (4) pages of the report to addressing causation. *See* Dr. Miller Report pp. 11-15 (Appendix B) (CR 50). Dr. Miller ultimately concludes that:

> As a direct cause, this facility and its staff failed to comply with those standards set forth in paragraph numbers: 1 , 2, 3, 4, 5, 6, 7, 8, 9, 10, 1 1, 12, 13, 14, 15, 16, 17, 18, 19, and 20. It is my opinion, based upon my experience, knowledge, qualifications and review of these records that these standards were not followed and the result was that Ms.

---

[1] Interestingly, GNH chooses to focus simply on its failure to provide Demings with the medication. However, it should be noted that Demings has asserted a number of breaches of duty in this matter, including the duty to provide the proper medication, that led to the demise of Ms. Demings. *See* Facts Section, *supra*, Page 3. These items are clearly addressed by the Miller and Kaper reports.

[2] *Collini v. Pustejovsky*, 280 S.W.3d 456 (Tex. App. Fort Worth 2009, no pet) and *HEB Grocery Co. v. Galloway*, 2014 WL 2152128 (Tex. App. – Beaumont 2014, not pet).

11

Legatha Demings was harmed and injured. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, which compromised her overall health and well-being, and resulted in an overall worsening of her condition, unnecessary and preventable pain, suffering, mental anguish, and loss of dignity. These injuries and illnesses could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed.

*See id.* at p. 14 (Appendix B) (CR 50). Dr. Miller did not simply state this opinion in a conclusory matter. Instead, he devotes pages 11-14 on providing the basis for his opinion, which includes, but is not limited to, the following matters:

- In the hospital, Ms. Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. Ms. Demings was discharged from the hospital on May 25, 2012. In his discharge summary, Ms. Demings' physician documented that this patient's stroke was of ". ..ischemic origin, most likely caused by her atrial fibrillation.

- In order to treat Ms. Demings' condition and prevent further strokes, her physician discharged her from the hospital on a blood-thinning medication, Xarelto. This physician stated in his discharge summary that Ms. Demings would be "...started (on) Xarelto for her anticoagulation to avoid further strokes. .."

- On May 25, 2012, Ms. Demings was discharged from the hospital and admitted to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas for further recovery and rehabilitation. According to Ms. Demings' physician, this resident had begun to make some improvement as evidenced by improvement in her speech and increased movement of her left side.

- After being in the care of Garrison Nursing Home and Rehabilitation Center for less than two weeks, Ms. Demings became "confused, combative, and unable to communicate". On June 8, 2012, she was taken by emergency medical services back to Nacogdoches Medical Center for emergency evaluation. There a

12

computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke.

- One of Ms. Demings' consulting physicians, a neurological specialist, documented in the medical record that Ms. Demings had suffered a "Cerebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis".

- Ms. Demings remained in the hospital for 12 days, and was discharged on June 20, 2012. At the time of her discharge from the hospital, Ms. Demings' physician noted in his discharge summary that this patient's overall medical condition had deteriorated as a result of her stroke she suffered at Garrison Nursing home and Rehabilitation Center, to the point that Ms. Demings was made a do-not-resuscitate status such that if she experienced a cardiovascular or respiratory failure, she would not be intubated or placed on a ventilator or breathing machine.

- A "Medication Error Report" made by the nursing staff of Garrison Nursing Home and Rehabilitation Center on June 8, 2012, documented that from the time Ms. Demings was first admitted to this facility on May 25, 2012 until the time of her stroke and transfer on June 8, 2012, Ms. Demings was not given her blood-thinning medication, Xarelto as ordered by her physician. This medication had been ordered to be given in a dose of 20 milligrams (mgs) at bedtime daily.

- This same report stated that "res. (resident) arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy — nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night".

- The Medication Error Report went on to document that a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)"... "an oversight". A question on this same form asked "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "Makes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

13

- On a subsequent hospitalization on August 5, 2012, in his pre-operative history and physical, one of Ms. Demings' physicians documented what had happened to her during her stay at Garrison Nursing Home and Rehabilitation Center from May 25, 2012 through June 8, 2012. This physician stated that prior to her first admission to this nursing home, Ms. Demings "was found in atrial fibrillation. She was started (on) Xarelto. Apparently... did not follow-through in the nursing home, and she had.. strokes, disabling, with severe _____. She was rendered substantially disabled."

- This physician also documented in his discharge summary of this August 5, 2012 hospital stay, the importance of a patient such as Ms. Demings who suffered with atrial fibrillation, to always remain on a blood-thinning medication such as Xarelto. He stated that "She is to continue with Xarelto. Instructions were given to the family to make sure that this medication is never stopped."

- The staff of Garrison Nursing Home and Rehabilitation Center in Garrison, Texas failed to appreciate that Ms. Legatha Demings was at the highest risk for the development of future strokes due to her past medical history which included hypertension, atrial fibrillation, a previous TIA and a previous stroke.

*See id.* at pp. 11-14 (Appendix B) (CR 50). What is more, Dr. Miller reviewed the report of Kaper, to which his report is supplementary. In Kaper's report, there is also a discussion concerning causation:

Causal Relationship Between the Failure and the Injury/Harm

Xarelto is a blood thinner, the precise purpose of which is to reduce the risk of stroke in patients who suffer from atrial fibrillation. Defendant(s) failed to provide Ms. Demings, with the Xarelto for fourteen (14) days . She then had a severe stroke, which would have in all reasonable medical probability been avoided had Ms. Demings been administered the Xarelto, the purpose of which was to prevent a stroke.

Further, the Medication Error Report generated by Defendant(s) clearly recognizes the problem of not administering the Xarelto to Ms. Demings Checking "YES" to the question of whether the "error"

14

(failure to administer the Xarelto to Ms. Demings), "could have endangered the life or welfare of the patient," the Director of Nursing stated:

> Makes her a higher risk for stroke in view of her diag. of atrial fibrillation (not taking it) Taking the medication makes res. higher risk for a bleed.

Atrial fibrillation causes the heart to pump irregularly, and the concern is that pooling blood can clot in the upper chambers of the heart. These clots may then sometimes travel through the body to the brain, with a stroke being the result. As a result, many patients diagnosed with atrial fibrillation are prescribed a blood thinner, one of which is Xarelto,

Xarelto is designed to block the enzyme called Factor Xa. Factor Xa is the activated form of the coagulation factor thrombokinase, known eponymously as Stuart-Prower factor. Factor X is an enzyme, a serine endopeptidase, which plays a key role at several stages of the coagulation system. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi, Factor Xa is inactivated by protein Z-dependent protease inhibitor ("ZPI"), a serine protease inhibitor (serpin). By inhibiting Factor Xa in this way, Xarelto is able to inhibit the dangerous blood clotting that can be a result of a patient suffering from atrial fibrillation:. Xarelto is well absorbed from the gut, and maximum inhibition of the Factor Xa occurs four hours after a dose. The intended effect lasts approximately 8-12 hours, but Factor Xa activity does not return to normal within 24 hours.

Given that Ms. Demings had previously suffered a mild CVA, likely as a result of clotting caused by atrial fibrillation, it was extremely important that she be placed on (and maintain) a regime of medication to reduce blood clotting. That is why Ms. Demings' treating physician prescribed the Xarelto. Ms. Demings entered Defendant(s) facility to rehabilitate herself. The family reports that she was doing very well, that she could communicate well, and that she was fully cognizant. According to the family, Ms. Demings was needing to gain strength in her hand. It was only after she stopped taking the medication that she suffered another, this time much more sever CVA that, according to

15

the family totally and completely incapacitated her. The medical records on June 8, 2012, indicate that any blood thinner that Defendant(s)had hurriedly administered to Ms. Demings had not taken effect in time to stave off the CVA.

Since June of 2012, while taking the Xarelto, Ms. Demings' medical records demonstrate that she has not suffered another CVA.

*See* Kaper Report 3-4 (Appendix A) (CR 25). The information contained in these two reports provides adequate information to inform GNH of (i.) the specific standards of care at issue, (ii.) the specific conduct of GNH that Demings has called into question, and (iii.) how GNH's conduct caused injury to her. Further, the information provided a basis for the trial court to conclude that the claims have merit, and are they are not frivolous. For these reasons, then, the statements on causation as provided by Kaper and Dr. Miller are more than sufficient to meet the requirements of the Medical Liability Act. GNH seems to interpret the Medical Liability Act to require Demings to provide a level of proof that is more attributable to what is expected at the final trial of this matter. Such is improper. The reports provide reasoned analysis on the matter that provides a basis for causation in this case. The trial court found the reports to be sufficient and denied GNH's objections and motion to dismiss. Should this Court disturb the trial court's decision in this case, such would be erroneous. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140 (Tex. 2015).

**D. <u>Alternatively, this is a matter of *res ipsa loquitur.*</u>**

For the reasons stated above, the expert reports that were furnished were sufficient to meet the requirements of the Medical Liability Act. To upset the trial court's ruling would be erroneous. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140 (Tex. 2015). Alternately, however, Demings also respectfully asserted in the trial court that an expert opinion in this case on causation is not required in this matter because the doctrine of *res ipsa loquitur* applies. *Res ipsa loquitur* is applicable when the following two circumstances are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *See Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990). *Res ipsa loquitur* is a rule of evidence by which negligence many be inferred, it is not a separate cause of action from negligence. *Id.* With regard to medical malpractice cases, *res ipsa loquitur* applies to those cases to which it had been applied as of August 29, 1977, the effective date of the Medical Liability Act. TEX. CIV. PRACT. & REM. CODE Ann. §74.201 (Jones McClure 2015). *Res ipsa loquitur* remains applicable to medical malpractice cases where the nature of the alleged malpractice and injuries are within the common knowledge of laymen, requiring no expert testimony. *Haddock*, 793 S.W.2d at 951. The *Haddock* case describes examples of areas where *res ipsa loquitur* has

been held to apply to medical malpractice claims: negligence in the use of mechanical instruments, operating on the wrong portion of the body, and leaving surgical instruments or sponges within the body. *Id.* This is the sort of case in which *res ipsa loquitur* applies. GNH clearly asserted in its own report that the failure to administer the Xarelto to Demings "makes her a higher risk for stroke in view of her diag. of atrial defibrillation." No expert is needed – causation is shown directly from GNH's own mouth. Put another way, GNH, by failing to provide the Xarelto to Demings caused her to suffer from the exact malady as what the medicine is intended to prevent – a stroke. That is by definition *res ipsa loquitur*. As such, Demings would alternatively argue that expert testimony on causation is not even necessary in this case.

## CONCLUSION AND PRAYER

**WHEREFORE PREMISES CONSIDERED**, Appellee Legatha Demings respectfully requests that the Court deny Appellants Garrison Nursing Home and Rehabilitation Center's and Garrison Nursing Home, Inc.'s appeal in this matter, affirm the order of the trial court in this matter, remand this matter to the trial court, and grant to her any and all further relief to which she may be justly entitled.

18

Respectfully Submitted,

**LAW OFFICE OF STEPHEN SHIRES, PLLC**
Attorney and Counselor at Law
123 San Augustine Street
Center, Texas 75935
Tel. (936) 598-3052
Fax. (936) 598-3031
stephen@shireslawfirm.com

By: /s/ Stephen Shires
**W. Stephen Shires**
**Texas Bar No. 50511894**
**Attorney for Legatha Demings**

## CERTIFICATE OF SERVICE

This is to certify that on the 9th day of November, 2015, a true and correct copy of the above and foregoing document was served on the following in accordance with the Texas Rules of Appellate Procedure:

Mr. David W. Frost
1121 ESE Loop 323, Suite 200
Tyler, Texas 75701
Facsimile (903) 581-3701

/s/ Stephen Shires
Stephen Shires

## CERTIFICATE OF WORD COUNT COMPLIANCE

I certify that the word count of this Appellee's Brief is 5801 words. I relied on the word count function of my word processor to determine this count. I certify that this brief compliance with the typed-volume limitations of Texas Rule of Appellate Procedure Number 9. It has been prepared in proportionately spaced typeface in 14 pt. Times New Roman font.

Dated: November 9, 2015

By: ___ /s/ Stephen Shires
Stephen Shires

19

# INDEX OF APPENDIX

A. Expert Report of Pauline Kaper

B. Expert Report of Dr. Keith Miller

C. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140 (Tex. 2015)

D. TEX. CIV. PRACT. & REM. CODE Ann. §74.201 (Jones McClure 2015)
   TEX. CIV. PRACT. & REM. CODE Ann. §74.351 (Jones McClure 2015)
   TEX. CIV. PRACT. & REM. CODE Ann. §74.403 (Jones McClure 2015)

# Appendix A

# DISABILITY NEEDS

## 116 Tenaha Street
## Center, Texas 75935

Phone: (936) 591-8900
Facsimile:    (936) 598-2300

Pauline Kaper, R.N.

---

January 10, 2014

Mr. Stephen Shires
Law Office of Stephen Shires PLLC
403 Nacogdoches Street, Suite 1
Center, Texas 75935

RE:   *Legatha Demmings v. Garrison Nursing Home and Rehabilitation Center, et. al.*,
Cause Number C1430319; In the District Court of Nacogdoches County, Texas

Dear Mr. Shires,

In response to your request for me to review the above-matter, the following is my report. It is my understanding that you have instituted suit against Defendants Garrison Nursing Home and Rehabilitation Center and Garrison Nursing Home, Inc., alleging that they, through their directors, officers, employees, and/or agents, committed negligence (and potentially gross negligence) against your client, Ms. Legatha Demmings, by failing to administer medication to her that had been prescribed to her by her treating physician. You allege that she then suffered a severe stroke that the said medication was intended to prevent. It is my further understanding that you are asserting that Defendant(s) also committed negligence by failing to have a procedure in place to insure that errors in transcription of records (as was the case in this matter) do not occur and/or are identified and corrected in a timely manner. The following constitutes my opinion as to the relevant standard of care governing nursing home conduct, how Defendants violated their duties/standard of care to Ms. Demmings, and how those violations proximately caused Ms. Demmings' injury.

## Applicable Standard of Care

In general, nursing facilities have the following duties, among others, as a part of their applicable standard of care:

1. to provide residents with timely and accurate care assessments and necessary supervision;
2. to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; and

1

3. to assist residents in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being.

Included within these general duties are the following particular duties that are particularly relevant in this case:

- the duty to make sure that residents receive all of their medications timely and in the appropriate doses;

- the duty to make sure that the resident's prescription(s) and/or orders are accurately transcribed by the nursing home staff onto the resident's charts/records and properly sent to be filled by the pharmacy; and

- the duty to have a system in place that insures the accuracy of said transcriptions.

## Manner in Which the Care Rendered by Defendants Failed to Meet the Applicable Standards of Care

In this matter, Ms. Demmings was a resident at Garrison Nursing Home and Rehabilitation Center for the purpose of seeking rehabilitation. She had been diagnosed with atrial fibrillation and previously suffered a mild ischemic cardiovascular accident ("CVA" or "stroke"), and as a result, her physician had prescribed Xarelto (20mg) to be taken to reduce the risk that she would suffer another (and possibly greater and much more severe) CVA. The medication was properly ordered by Dr. Dennis Calhoun. However, due to an error in the transcription of the order by a nurse in the employ of Defendant(s), the Xarelto was not included in the list of medications that Defendant(s) was to provide for Ms. Demmings. According to the Medication Error Report generated by Defendant(s):

> Error in transcription of order [(Written doctor's order from hospital)] – res. arrived after 5:00/p.m. on a Friday. This medication was ordered along [with] all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 p.m. so they could be delivered that night. Nurse transcribing failed to transcribe this med. to MAR. An oversight.

At that time, Defendant did not appear to have a system in place to insure that orders are transcribed properly. As a result, the pharmacy did not fill a prescription for Xarelto for Ms. Demmings, and from May 25, 2012, through June 8, 2012, Defendant(s) did not administer any Xarelto to Ms. Demmings, as her doctor had prescribed.

Further, it appears from that same Medication Error Report that at some point on June 8, 2012, after Defendant(s) realized that they made a mistake in not giving Ms. Demmings the Xarelto, Ms. Demmings then was administered three doses of the medication (60 mg) in a very short period of time. This creates a very dangerous situation for Ms. Demmings.

On June 8, 2012, Ms. Demmings suffered a subsequent, very severe CVA.

For reasons that should be apparent on their face, it is imperative that nursing homes administer the proper medication in the proper amount to its residents. Certainly, this is an

2

important issue for all medical personnel, including pharmacists, because even to a healthy person, ingestion of the wrong medication (or the wrong dose) may be extremely harmful, toxic and in some cases even lethal. This concern is magnified exponentially for residents in nursing homes, many of whom are already in a weakened physical condition. Further, the failure to continue a regime of medication that has already been introduced into the body can complicate the physical problems that the patient suffers from, and may cause problems with any other medications that he or she is taking.

Therefore, it is crucial that when a new resident is admitted to the facility that his or her information be properly transcribed, especially when it comes to prescriptions and medications. For example, should information about an allergy to a medication be omitted, such could lead to a very dangerous situation. The exact same thing is true here where the error in the transcription of the order/records caused Defendants to fail to administer a medication to Ms. Demmings, the purpose of which was to prevent any further (or more severe) strokes. As such, it is extremely important that the facility have a process in place to verify that the transcription is correct, or that any mistake be caught as quickly as possible and fixed. No such process existed in this case, and as a result of Ms. Demmings not taking the Xarelto, she suffered a severe stroke while in the care of Defendant(s).

## Causal Relationship Between the Failure and the Injury/Harm

Xarelto is a blood thinner, the precise purpose of which is to reduce the risk of stroke in patients who suffer from atrial fibrillation. Defendant(s) failed to provide Ms. Demmings with the Xarelto for fourteen (14) days. She then had a severe stroke, which would have in all reasonable medical probability been avoided had Ms. Demmings been administered the Xarelto, the purpose of which was to prevent a stroke.

Further, the Medication Error Report generated by Defendant(s) clearly recognizes the problem of not administering the Xarelto to Ms. Demmings. Checking "YES" to the question of whether the "error" (failure to administer the Xarelto to Ms. Demmings), "could have endangered the life or welfare of the patient," the Director of Nursing stated:

Makes her a higher risk for stroke in view of her diag. of atrial fibrillation (not taking it)  Taking the medication makes res. higher risk for a bleed.

Atrial fibrillation causes the heart to pump irregularly, and the concern is that pooling blood can clot in the upper chambers of the heart. These clots may then sometimes travel through the body to the brain, with a stroke being the result. As a result, many patients diagnosed with atrial fibrillation are prescribed a blood thinner, one of which is Xarelto.

Xarelto is designed to block the enzyme called Factor Xa. Factor Xa is the activated form of the coagulation factor thrombokinase, known eponymously as Stuart-Prower factor. Factor X is an enzyme, a serine endopeptidase, which plays a key role at several stages of the coagulation system. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi. Factor Xa is inactivated by protein Z-dependent protease inhibitor ("ZPI"), a serine protease inhibitor (serpin). By inhibiting Factor Xa in this way, Xarelto is able to inhibit the dangerous blood clotting that can be a result of a patient suffering from atrial fibrillation. Xarelto is well

3

absorbed from the gut, and maximum inhibition of the Factor Xa occurs four hours after a dose. The intended effect lasts approximately 8-12 hours, but Factor Xa activity does not return to normal within 24 hours.

Given that Ms. Demmings had previously suffered a mild CVA, likely as a result of clotting caused by atrial fibrillation, it was extremely important that she be placed on (and maintain) a regime of medication to reduce blood clotting. That is why Ms. Demmings' treating physician prescribed the Xarelto. Ms. Demmings entered Defendant(s)' facility to rehabilitate herself. The family reports that she was doing very well, that she could communicate well, and that she was fully cognizant. According to the family, Ms. Demmings was needing to gain strength in her hand. It was only after she stopped taking the medication that she suffered another, this time much more sever CVA that, according to the family totally and completely incapacitated her. The medical records on June 8, 2012, indicate that any blood thinner that Defendant(s) had hurriedly administered to Ms. Demmings had not taken effect in time to stave off the CVA.[1]

Since June of 2012, while taking the Xarelto, Ms. Demmings' medical records demonstrate that she has not suffered another CVA.[i]

Summary of Expert Opinion

Defendant failed to meet its applicable standard of care in this case. Defendant breached the general and specific duties that it owed to Ms. Demmings. Namely, Defendant:

- breached its duty to provide Ms. Demmings with necessary supervision;
- breached its duty to use reasonable care in treating Ms. Demmings with the degree of skill and learning ordinarily possessed and used by nursing home facilities East Texas;
- breached its duty to assist Ms. Demmings in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being;
- breached its duty to make sure that Ms. Demmings received all of their medications timely and in the appropriate doses – namely the prescribed Xarelto;
- breached its duty to make sure that Ms. Demmings' prescription(s) and/or orders were accurately transcribed by the nursing home staff onto her charts/records/orders and to properly send her prescription to be filled by the pharmacy – namely failing to include Xarelto as one of the medications for the pharmacy to fill; and
- breached its duty to have a system in place that insures the accuracy of the transcription of Ms. Demmings' prescription order.

Defendant's breach of its duties (as described above) in this case directly and proximately caused the injuries suffered by Ms. Demmings –namely the stroke she suffered on June 8, 2012. What makes matters even worse is that the family members state that they repeatedly informed

---

[1] In fact, administering such a large amount of Xarelto in such a short period of time after not giving it to Ms. Demmings for two weeks was likely detrimental to Ms. Demmings, and it likely also contributed to causing the severe CVA. If this was done without the express direction of the treating physician, then this would constitute another violation of the standard of care by Defendants.

4

the nursing home staff that Ms. Demmings was supposed to be receiving the Xarelto, and apparently no one in Defendant's organization decided to check the records to see if a mistake had been made. It was only when Ms. Demmings was being taken to the hospital that Defendant(s) realized their mistake. According to the the Medication Error Report generated by Defendant(s):

> How was the error discovered? Prior to transfer to Hosp. Chg. Nurse When talking [with] Dr. Coffman realized medication not on MAR & reported to C. Hughes. When? 9:00 AM 6/8/12.

I have developed the foregoing opinions after reviewing:

- Various medical records of Ms. Demings, specifically including, but not limited to, records from Nacogdoches Medical Center for admission on May 22, 2012, and June 8, 2012;
- The "Medication Error Report" generated by Defendant(s); and
- Other information provided by Ms. Demmings' family.


Date:   January 10, 2014

*Pauline Kaper, R.N.*
Pauline Kaper, RN

---

[i] Although, it appears that Ms. Demmings may have suffered a mild Transient Ischemic Attack ("TIA") on March 3, 2014, almost two (2) years later. The family reports that all symptoms of the TIA had resolved themselves by the time Ms. Demmings reached the emergency room.

# Medication Error Report

Date of Report __6/8/12__

Patient __Demings__, ~~Demmings~~, LaGayna (Last Name First)

Physician __Dr. Dennis Coffman__

Room No. __400 B__

Date of Error __5/25/12 - 6/8/12__

Time of Error ____ A.M. __P.M.__

Medication Given __NOT__ __Xarelto~~20mg~~__

Dosage Given __NOT__ __20mg__

Rte. of Admin. __P.O. @ HS__

What was Physician's order? __Xarelto 20mg ⊤ P.O. @ HS__
__(rec'd three doses of this medication after admit to NH)__

What was your source of information regarding the medication given? ☐ Kardex  ☐ Chart  ☐ Verbal Order  __Written doctors order from hospital__

. Reason for making error: __Error in transcription of order - res. arrived after 5⁰⁰PM on a Friday. This medication was ordered along ⊤ all other meds from nursing home pharmacy - nurse transcribing orders had to have all meds written on pharmacy order sheets & faxed in to pharmacy by 6 PM. so they could be delivered that night. Nurse transcribing failed to transcribe this med. to MAR an oversight.__

Could the error have endangered the life or welfare of the patient? ____

☑ Yes  ☐ No  Explain: __Makes her a higher risk for stroke. in view of her diag. of atrial fibrillation (not taking it)  Taking the medication makes res. higher risk for a bleed.__

What is the actual effect of the error made on the patient? __unknown.__

How was the error discovered? __Prior to transfer to Hosp. Chg. Nurse when talking ⊤ Dr. Coffman realized medication not on mar & reported to C. Bigham__

By whom? __Brittany Bartek LVN__  When? __9:00 Am 6/8/12__

Who notified the physician? __Brittany Bartek__  When? __6/8/12  930A / phone__

Has he seen the patient since the error was made? ☑ Yes  ☐ No

What precautions can you take to prevent a similar error? __Always have two nurses check orders on new admissions to make sure transcribed correctly.__

Signature: Nurse making error __Cathy S/n__  Date __6/8/12__

Signature: Director of Nursing __Stephani Anderson__  Date __6/8/12__

Signature: Physician ____  Date ____

Curriculum Vitae of

**LOIS PAULINE KAPER, R.N.**
878 County Road
Joaquin, Texas 75954-3318
Phone 936-248-4514

## PERSONAL:

Marital status:  Married.
Date of Birth:  August 3, 1939.

## EDUCATION:

Alvin Junior College
August 1972 - Associate in Applied Science Degree
San Jacinto Junior College
May 1979 Nursing Home Administrator #4392

## LICENSE:

Registered Nurse #2-28164
Nursing Home Administration

## TEACHING:

August - November 1984 Instructor Alvin Community College
Medication Administration course to certify Medication Aides

## EXPERIENCE AND RECOGNITIONS:

### August 1972 - June 1974
Registered Nurse at U.T.M.B. in Galveston, Texas.

### July 1974 - May 1979
Director of Nursing at Manor Care - Texas City.   Managed 40 nursing facility employees and staffing for a 110 bed nursing home.

### May 1979 - November 1983
Administrator at Manor Care - Texas City.   Managed 100 employees. Operated the facility within budget.   Implemented a safety program which reduced lost time accidents. One year with no accidents.   Reduced the aged accounts to a minimum.   Developed an incentive plan and reduced sick time to almost zero.   Developed policies and procedure manuals.   During my administration, the facility maintained a Superior Rating with the Texas Department of Health.   Increased the private pay census to 50% and had a waiting list for admissions.

## September 7, 1983: Recognition By The State Board Of Nursing Homes

Manor Care Nursing Home received a direct hit by Hurricane Alicia. My staff of twenty-two employees and I cared for over ninety residents. State Board of Nursing Recognized my facility for the job that we did during the hurricane.

## December 1983 - December 1984

Registered Nurse Coordinator of Home Health Services at Memorial Hospital of Galveston County. Employed to start up a new department of Home Health Service, Coordinating services in the home for Nursing, Physical Therapy, Occupational Therapy and Speech. Coordinated a staff of 8 and worked wit the doctors and Social Services to receive referrals. Developed forms, policies and procedures manual to develop the Home Health Department.

## June 1984 -March 1986

### State of Texas v Autumn Hills Convalescent Center, Inc.

Requested by the Assistant Attorney General of Texas, David Marks to work with the prosecution of the staff and management of Autumn Hill Nursing Home. The case concerned the multiple deaths of nursing home patients but specifically Elnora Breed. As reported, "In November 1978, Mrs. Kaper, R.N. a nursing consultant was hired by Autumn Hills Nursing Home after the state health department found problems at the home. Mrs. Kaper was to create and put in place a plan of correction for the problems. Mrs. Kaper consulted with the staff and patients for three weeks and the state came back and the problems were resolved at that time." Mrs. Kaper worked with the special prosecutor during the six month trial where she testified multiple times concerning the murder case. The *State of Texas v Autum Hills Convalescent Center, Inc.* revolved around the widespread care and deprivation and harm caused by a corporation's financial decision to cut essential services and supplies in order to maximize profits.

## January 1985 - 1986

Manor Healthcare, Inc.: Asked to trouble shoot for a nursing home that was in trouble as Administrator for Clear Lake Care Center in Webster, Texas. This nursing home was in serious trouble with multiple deficiencies and placed on vendor hold by the state of Texas. Brought facility out of vendor hold in forty-six days.

## August 1986 - June 1995

Manor Healthcare, Inc. Began as a trouble shooter for the twenty nursing homes in Texas, Arkansas, Oklahoma, and New Mexico. At this same time was Nursing Home Administrator for Pine Grove Nursing Home in Center, Texas. Managed 80 employees. Operated the facility within budget. 110 Bed skilled facility.

<u>June 1989</u>
Received Nursing Home Administrator Of The Year Award from the Texas Board Of Nursing Home Administrators.

<u>June 1990 - August 2005</u>
Nursing Home Administrator of Green Acres Nursing Home Center, Texas. Managed 90 employees.   Operated the facility within budget.   109 Bed skilled facility.

<u>January 2006 - present</u>
Registered Nurse employed by Disability Needs, Inc..
Work directly with attorneys and Pamela Cunningham non-attorney disability representative.
Maintain all medical records received on the 80 to 100 disability clients that are represented at any given time.
Prepare an outline about the client and his or her physical and mental status. Within the outline read and write about all medical records on each and every visit.   From the medical records state in the outline the reason for the visit, the diagnosis, the current vital signs and description, and the plan of action for that client.
Meet with every client and prepare all documentation required by the Texas Disability Determination Services in Austin, Texas.   Discuss by phone with physicians and medical personal who are making the decisions concerning the medical   condition of the client to make sure they have all current documentation.

# Appendix B

NO. C-14-30319

| | | |
|---|---|---|
| **LEGATHA DEMINGS** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **145th JUDICIAL DISTRICT** |
| | § | |
| **GARRISON NURSING HOME AND** | § | |
| **REHABILITATION CENTER AND** | § | |
| **GARRISON NURSING HOME, INC.** | § | |
| **Defendants.** | § | **OF NACOGDOCHES COUNTY, TEXAS** |

## PLAINTIFF'S SUPPLEMENTAL EXPERT REPORT

**COMES NOW** Legatha Demings ("Demings" or "Plaintiff") and files this her Supplemental Expert Report in this matter, and in support thereof respectfully shows the Court as follows:

1. On April 6, 2015, the Court heard Defendants' Motion to Dismiss, wherein Defendants asserted that the expert report proffered by Demings in this matter was deficient.

2. On April 6, 2015, the Court signed and entered an Order (filed on April 7, 2015) that denied Defendants' Motion to Dismiss, but found that the expert report was deficient in that "it was not created by a physician as required by Section 74.351 (r) (5) (c)."

3. The Court granted Demings a thirty (30) day extension to cure the deficiency pursuant to Section 74.351.

4. Demings now supplements the expert report that she previously filed in this matter with the attached expert report of Keith E. Miller, M.D., which, among other things, addresses causation in this matter. Dr. Miller's report addresses all the issues of the case, cures the deficiency identified by the Court, and is supplemental to the expert report previously filed by Plaintiff in this matter.

5. Dr. Miller's expert report and *curriculum vitae* are attached hereto and incorporated by

1

reference herein (and in the previous expert report from Pauline Kaper) for all purposes as if recited verbatim.

Respectfully Submitted,
LAW OFFICE OF STEPHEN SHIRES, PLLC
Attorney and Counselor at Law
123 San Augustine Street
Center, Texas 75935
Tel. (936) 598-3052
Fax. (936) 598-3031
stephen@shireslawfirm.com

By: /s/ Stephen Shires
**W. Stephen Shires**
**Texas Bar No. 50511894**
**Attorney for Legatha Demings**

## CERTIFICATE OF SERVICE

This is to certify that on the 5th day of May, 2015, a true and correct copy of the above and foregoing document was served on the following in accordance with the Texas Rules of Civil Procedure:

Mr. David W. Frost
1121 ESE Loop 323, Suite 200
Tyler, Texas 75701
Facsimile (903) 581-3701

/s/ Stephen Shires
Stephen Shires

*Keith E. Miller, M.D., F.A.C.F.P.*

620 Tenaha Street • Center, Texas 75935
(936) 598-2716 • Fax (936) 598-5059

May 4, 2015

Mr. W. Stephen Shires, Attorney at Law
The Law Offices of Stephen Shires, P.L.L.C.
123 San Augustine Street
Center, Texas  75935

Re:  Ms. Legatha Demings

Dear Mr. Shires:

Thank you for allowing me to review this case on behalf of Ms. Legatha Demings.  My opinions in this report are based on the information I have reviewed to date and my education, training, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Legatha Demings as described in the materials I have reviewed and discussed in this report.  Each opinion is based on reasonable medical and nursing, probability and certainty.

## BACKGROUND

My name is Keith E. Miller, M.D., and I give this report for the purpose of complying with any applicable provisions or codes.  As my attached curriculum vitae demonstrates and which is incorporated into this report by reference, I am a Medical Doctor currently licensed to practice in the State of Texas and formerly licensed in the States of Louisiana and Arkansas.  I currently practice in nursing homes similar to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas.  I have had numerous patients similar to Ms. Legatha Demings.  I am board-certified in Family Medicine and I have been in practice for more than 25 years.  By virtue of my education, training, and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case.



I am over the age of 18, of sound mind, and capable of preparing this expert medical report. My opinions in this report are based on the information I have reviewed to date, as well as my education, training, knowledge, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Legatha Demings, as described in the materials I have reviewed and discussed in this report. My opinions are based on reasonable medical and nursing, probability and certainty. My opinions concern the care and treatment received by Ms. Legatha Demings, or lack thereof, in regard to the applicable standards of care and the manner, in which the care rendered to Ms. Legatha Demings by the healthcare facility in this case, fell below the standards of care and caused the illnesses of Ms. Legatha Demings.

It is impossible in an expert medical report to marshal all of the proof regarding the standard of care, breach, and causation and include it within my expert opinions in this case. My report represents a good faith effort to inform the health-care facility of the specific conduct that I am calling into question and to provide a basis for anyone to conclude that the claims in this matter have merit. Obviously, any defendant in a medical malpractice case has medical knowledge of medical terms which, when read in context with my opinions, will be clear to any competent healthcare facility.

This report will provide a summary of my opinions, as of this date, regarding: 1) the applicable standards of care at issue in this case; 2) how the applicable standards of care were violated and breached; 3) how the violations and breaches of the applicable standards of care resulted in the illnesses of Ms. Legatha Demings; and 4) what the health-care facility in this case should have done differently to prevent the illnesses of Ms. Demings. I reserve the right to amend, or add to, my opinions upon review of new records, testimony, or facts, as they become available, or upon further review of existing materials.

## MY EXPERTISE

I am a medical doctor currently licensed to practice in the State of Texas and formerly licensed in the States of Louisiana and Arkansas. I have been a licensed medical doctor since 1985, have been practicing medicine continuously since then, including during the time of this claim, and as part of my practice, have been, and am currently, involved in the diagnosis, care, and treatment of many patients similar to Ms. Legatha Demings. I am familiar with the diagnosis and treatment of patients with cerebral vascular accidents (strokes), hypertension, related illnesses and their complications, along with any other conditions experienced by Ms. Legatha Demings. I am familiar with the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs that treat patients such as Ms. Demings.

---

Report of Keith E. Miller, M.D.          Page 2

My training is similar to the training of the physician, healthcare providers, nurses, and facility staff in this case.

After graduating from medical school in 1985 at the University of Arkansas, I received additional training and experience in a family practice residency program which I successfully completed in 1988. I have over 25 years' experience practicing medicine in office settings, hospitals, nursing homes, rehabilitation centers and emergency departments. I am board-certified in Family Medicine by the American Board of Family Medicine, and have been in practice for more than 25 years. By virtue of my education, training, knowledge and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case, including the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs treating patients for strokes, hypertension, related illnesses and their complications, along with any other conditions exhibited by Ms. Legatha Demings, because I have treated many patients with these conditions.

## A COPY OF MY CV IS ATTACHED

My attached curriculum vitae is incorporated herein as part of my report.

## MATERIALS REVIEWED

The specific records and documents concerning Ms. Legatha Demings which I have reviewed include the following:

1) Medical Records of Ms. Legatha Demings from Nacogdoches Medical Center in Nacogdoches, Texas;
2) Garrison Nursing Home and Rehabilitation Center in Garrison, Texas;
3) Plaintiff's Original Petition; and
4) Expert Nursing Report of Pauline Kaper, R.N.

## SIGNIFICANT FACTS

Ms. Legatha Demings is an adult female whose date of birth is April 28, 1945. In May 2012, Ms. Demings was 67 years-old. She had a past medical history of hypertension, atrial fibrillation, congestive heart failure, emphysema, and a previous transient ischemic attack (TIA).

On May 22, 2012, Ms. Demings was living at home. She suddenly developed slurred speech, weakness in her extremities, and she fell out of bed. She was taken to a hospital in Carthage, Texas, and then subsequently

transferred to Nacogdoches Medical Center in Nacogdoches, Texas for further evaluation and treatment.

In the hospital, Ms. Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. Ms. Demings was discharged from the hospital on May 25, 2012. In his discharge summary, Ms. Demings' physician documented that this patient's stroke was of "...ischemic origin, most likely caused by her atrial fibrillation."

In order to treat Ms. Demings' condition and prevent further strokes, her physician discharged her from the hospital on a blood-thinning medication, Xarelto. This physician stated in his discharge summary that Ms. Demings would be "...started (on) Xarelto for her anticoagulation to avoid further strokes..."

On May 25, 2012, Ms. Demings was discharged from the hospital and admitted to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas for further recovery and rehabilitation. According to Ms. Demings' physician, this resident had begun to make some improvement as evidenced by improvement in her speech and increased movement of her left side.

After being in the care of Garrison Nursing Home and Rehabilitation Center for less than two weeks, Ms. Demings became "confused, combative, and unable to communicate". On June 8, 2012, she was taken by emergency medical services back to Nacogdoches Medical Center for emergency evaluation. There a computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke.

One of Ms. Demings' consulting physicians, a neurological specialist, documented in the medical record that Ms. Demings had suffered a "Cerebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis".

Ms. Demings remained in the hospital for 12 days, and was discharged on June 20, 2012. At the time of her discharge from the hospital, Ms. Demings' physician noted in his discharge summary that this patient's overall medical condition had deteriorated as a result of her stroke she suffered at Garrison Nursing home and Rehabilitation Center, to the point that Ms. Demings was made a do-not-resuscitate status such that if she experienced a cardiovascular or respiratory failure, she would not be intubated or placed on a ventilator or breathing machine.

A "Medication Error Report" made by the nursing staff of Garrison Nursing Home and Rehabilitation Center on June 8, 2012, documented that from the

time Ms. Demings was first admitted to this facility on May 25, 2012 until the time of her stroke and transfer on June 8, 2012, Ms. Demings was not given her blood-thinning medication, Xarelto as ordered by her physician. This medication had been ordered to be given in a dose of 20 milligrams (mgs) at bedtime daily.

This same report stated that "res. (resident) arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night".

The Medication Error Report went on to document that a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)"..."an oversight". A question on this same form asked "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "Makes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

On a subsequent hospitalization on August 5, 2012, in his pre-operative history and physical, one of Ms. Demings' physicians documented what had happened to her during her stay at Garrison Nursing Home and Rehabilitation Center from May 25, 2012 through June 8, 2012. This physician stated that prior to her first admission to this nursing home, Ms. Demings "was found in atrial fibrillation. She was started (on) Xarelto. Apparently... did not follow-through in the nursing home, and she had...strokes, disabling, with severe _____. She was rendered substantially disabled."

This physician also documented in his discharge summary of this August 5, 2012 hospital stay, the importance of a patient such as Ms. Demings who suffered with atrial fibrillation, to always remain on a blood-thinning medication such as Xarelto. He stated that "She is to continue with Xarelto...Instructions were given to the family to make sure that this medication is never stopped."

## FAMILIARITY WITH THE STANDARD OF CARE

At the time of the care and treatment of Ms. Legatha Demings by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, from May 2012 through June 2012, I was familiar with the minimum medical standards of care applicable to the assessment, diagnosis and treatment of patients with strokes, hypertension, and related illnesses, as well as their complications and other medical conditions similar to those experienced by Ms. Legatha Demings and described in the referenced medical records. I am familiar with the medical and nursing standards of care for the above referenced conditions applicable to

Garrison Nursing Home and Rehabilitation Center in Garrison, Texas. The minimum standards of care for treatment of patients with similar signs, symptoms, and conditions as Ms. Legatha Demings that are the basis of this report, are national standards of care and do not differ from community to community.

From the time of the medical treatment of Ms. Legatha Demings from May 2012 through June 2012, and through the present, I have had an active clinical practice as a family practitioner in Center, Texas that includes providing care to adult patients in nursing homes and rehabilitation centers, such as Ms. Legatha Demings. During my career as a family practitioner, I have worked with and or supervised medical office staff, hospital staff, nursing home staff, and rehabilitation center staff, including medical technologists and nurses, in the care of my patients. I have also participated in the development and use of protocols, policies and procedures for the care of patients with strokes, hypertension, and related illnesses, as well as their causes and complications, including adults such as Ms. Legatha Demings. In addition, based on my education, training, knowledge, and direct experience, I am familiar with the accepted and expected, standards of care, as listed below, for nursing home and rehabilitation center facilities, who take care of patients with conditions such as strokes, hypertension, related illnesses, and their complications, and can offer opinions on the standards of care, the breaches of the standards of care and the causation of the injuries from these breaches.

In my medical practice, I routinely rely on medical records, nursing records, lab reports, diagnostic tests and images, consulting physician reports and other patient data. I consider materials of this type to be generally reliable, unless evidenced otherwise, and they are the type of materials routinely relied upon by physicians and clinical staff in providing care to patients.

## CASE SPECIFIC EXPERTISE

At the time of the medical treatment of Ms. Legatha Demings, from May 2012 through June 2012, I was treating patients with symptoms similar to those experienced by Ms. Demings. I am familiar with the accepted medical and nursing standards of care applicable to the assessment, diagnosis, and treatment of patients with strokes, hypertension, and related illnesses, as well as any other medical conditions similar to those experienced by Ms. Legatha Demings during that time as described in the referenced medical records. I am familiar with the standards of care for physicians, nurses, and nursing home and rehabilitation center staff treating patients such as Ms. Demings. I am familiar with the medical and nursing standards of care for the above referenced medical conditions, including strokes, hypertension, related illnesses, and their

complications, as they apply to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas. The accepted and applicable standards of care for the treatment of patients with similar signs, symptoms, and conditions as Ms. Legatha Demings, that are the basis of this report, are national standards of care and do not differ from community to community, and also apply to the specific medical care provided to Ms. Demings in this case. The accepted medical and nursing standards of care for the assessment, diagnosis, and treatment of medical conditions similar to those of Ms. Legatha Demings apply to all nursing home and rehabilitation center facilities. I know the accepted standards of care, the breaches and violations of the standards of care, and the causation link between the breaches and violations of the standards of care and the illnesses, of Ms. Legatha Demings, as they apply to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, on the basis of my education, knowledge, training, and direct experience.

I acquired this education, knowledge, training and experience through:

1) My attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

2) Practical experience of diagnosing and treating patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

3) Discussions with colleagues at yearly conferences, seminars and meetings;

4) Study of technical works routinely published in textbooks, journals and literature concerning the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

5) My routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

6) My routine and regular contact with nursing home nurses, staff and residents who take care of patients with the same or similar conditions as Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications;

7) My knowledge and experience giving lectures and in-service conferences to the nurses and staff;

8) My experience serving on numerous hospital and nursing home committees; and

9) My observation of nurses and nurse conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to Ms. Legatha Demings, and for illnesses related to strokes, hypertension, and their complications.

## FACILITY - PATIENT RELATIONSHIP

Based upon the above facts, there was a facility-patient relationship established between Ms. Legatha Demings and Garrison Nursing Home and Rehabilitation Center in Garrison, Texas.

## DUTY

There was a duty owed to Ms. Legatha Demings by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, to do what a reasonable nursing home or rehabilitation center would have done under the same or similar circumstances, or not to do what a reasonable nursing home or rehabilitation center would not have done under the same or similar circumstances.

## RELEVANT STANDARDS OF CARE IN ISSUE

This section addresses some of the principal applicable standards of care that Garrison Nursing Home and Rehabilitation Center in Garrison, Texas and its staff should have met for Ms. Legatha Demings, specifically how Garrison Nursing Home and Rehabilitation Center and its staff breached the standards of care and the causal relationship of the breach to Ms. Demings' illnesses and related complications. These standards are based on my education, training, and direct experience, and are reflected in the state and federal regulations that govern nursing homes, rehabilitation centers, and skilled nursing facilities.

The following standards, among others, are consistent with the standards of care that were required to be followed by Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, and its staff as it concerns Ms. Legatha Demings:

1. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and reg-

istered nurses with advanced practice authorization shall: (A) Know and conform to the Texas Nursing Practice Act and the Board's rules and regulations as well as all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice;

2. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (B) Implement measures to promote a safe environment for clients and others;

3. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (C) Know the rationale for and the effects of medications and treatments and shall correctly administer the same;

4. **TAC Subchapter H Rule §19.701.** A facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life. (5) Accommodation of needs. A resident has the right to: (A) reside and receive services in the facility with reasonable accommodation of individual needs and preferences, except when the health or safety of the individual or other residents would be endangered;

5. **TAC Subchapter B Rule §19.101 Neglect** - A deprivation of life's necessities of food, water, or shelter, or a failure of an individual to provide services, treatment, or care to a resident which causes or could cause mental or physical injury, or harm or death to the resident.

6. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (D) Accurately and completely report and document: (iii) physician, dentist, or podiatrist orders; (iv) administration of medications and treatments; (v) client responses(s); and (vi) contacts with other health care team members concerning significant events regarding client's status; (G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices; (N) Clarify any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment.

7. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and

registered nurses with advanced practice authorization shall: (F) Promote and participate in education and counseling to a client(s) and, where applicable, the family/significant other(s) based on health needs;

8. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices;

9. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (M) Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications;

10. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (T) Accept only those nursing assignments that take into consideration client safety and that are commensurate with the nurse's educational preparation, experience, knowledge, and physical and emotional ability;

11. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (U) Supervise nursing care provided by others for whom the nurse is professionally responsible;

12. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice** (3) Standards Specific to Registered Nurses. The registered nurse shall assist in the determination of healthcare needs of clients and shall: (A) Utilize a systematic approach to provide individualized, goal-directed, nursing care by: (i) performing comprehensive nursing assessments regarding the health status of the client; (ii) making nursing diagnoses that serve as the basis for the strategy of care; (iii) developing a plan of care based on the assessment and nursing diagnosis; (iv) implementing nursing care; and (v) evaluating the client's responses to nursing interventions;

13. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (1) Unsafe Practice – actions or conduct including, but not limited to: (A) Carelessly failing, repeatedly failing, or exhibiting an inability to perform vocational, registered, or advanced practice nursing in conformity with the standards of minimum

acceptable level of nursing practice set out in Rule 217.11.

14. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (1) Unsafe Practice – actions or conduct including, but not limited to: (B) Carelessly or repeatedly failing to conform to generally accepted nursing standards in applicable practice settings;

15. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct** (4) Careless or repetitive conduct that may endanger a client's life, health, or safety. Actual injury to a client need not be established.

16. **42 CFR 483.20, 483.25-**The facility must conduct initially a comprehensive, accurate assessment of each resident's functional capacity, a plan of care, based on a resident assessment, which will be used to provide care and services to attain the highest practical physical, mental, and psychosocial well-being;

17. **42 CFR 483.15-** A facility must care for its residents in a manner that promotes quality of life and dignity;

18. **42 CFR 483.30-** The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care;

19. **42 CFR 483.13, F 224- "Neglect"** means failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness.

20. **42 CFR 483.20 (k) (3) (I)** - The services provided or arranged by the facility must meet professional standards of quality;

## HOW THE STANDARDS OF CARE WERE BREACHED AND CAUSED INJURY, HARM, OR DAMAGES

### Illnesses Caused by Failing to Properly Administer Medications

Ms. Legatha Demings is an adult female whose date of birth is April 28, 1945. In May 2012, Ms. Demings was 67 years-old. She had a past medical history of hypertension, atrial fibrillation, congestive heart failure, emphysema, and a previous transient ischemic attack (TIA).

On May 22, 2012, Ms. Demings was living at home. She suddenly developed slurred speech, weakness in her extremities, and she fell out of bed. She was taken to a hospital in Carthage, Texas, and then subsequently transferred to Nacogdoches Medical Center in Nacogdoches, Texas for further evaluation and treatment.

In the hospital, Ms. Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. Ms. Demings was discharged from the hospital on May 25, 2012. In his discharge summary, Ms. Demings' physician documented that this patient's stroke was of "...ischemic origin, most likely caused by her atrial fibrillation."

In order to treat Ms. Demings' condition and prevent further strokes, her physician discharged her from the hospital on a blood-thinning medication, Xarelto. This physician stated in his discharge summary that Ms. Demings would be "...started (on) Xarelto for her anticoagulation to avoid further strokes..."

On May 25, 2012, Ms. Demings was discharged from the hospital and admitted to Garrison Nursing Home and Rehabilitation Center in Garrison, Texas for further recovery and rehabilitation. According to Ms. Demings' physician, this resident had begun to make some improvement as evidenced by improvement in her speech and increased movement of her left side.

After being in the care of Garrison Nursing Home and Rehabilitation Center for less than two weeks, Ms. Demings became "confused, combative, and unable to communicate". On June 8, 2012, she was taken by emergency medical services back to Nacogdoches Medical Center for emergency evaluation. There a computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke.

One of Ms. Demings' consulting physicians, a neurological specialist, documented in the medical record that Ms. Demings had suffered a "Cerebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis".

Ms. Demings remained in the hospital for 12 days, and was discharged on June 20, 2012. At the time of her discharge from the hospital, Ms. Demings' physician noted in his discharge summary that this patient's overall medical condition had deteriorated as a result of her stroke she suffered at Garrison Nursing home and Rehabilitation Center, to the point that Ms. Demings was made a do-not-resuscitate status such that if she experienced a cardiovascular or respiratory failure, she would not be intubated or placed on a ventilator or breathing machine.

A "Medication Error Report" made by the nursing staff of Garrison Nursing Home and Rehabilitation Center on June 8, 2012, documented that from the time Ms. Demings was first admitted to this facility on May 25, 2012 until the time of her stroke and transfer on June 8, 2012, Ms. Demings was not given her blood-thinning medication, Xarelto as ordered by her physician. This medication had been ordered to be given in a dose of 20 milligrams (mgs) at bedtime daily.

This same report stated that "res. (resident) arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night".

The Medication Error Report went on to document that a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)"..."an oversight". A question on this same form asked "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "Makes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

On a subsequent hospitalization on August 5, 2012, in his pre-operative history and physical, one of Ms. Demings' physicians documented what had happened to her during her stay at Garrison Nursing Home and Rehabilitation Center from May 25, 2012 through June 8, 2012. This physician stated that prior to her first admission to this nursing home, Ms. Demings "was found in atrial fibrillation. She was started (on) Xarelto. Apparently… did not follow-through in the nursing home, and she had…strokes, disabling, with severe ____. She was rendered substantially disabled."

This physician also documented in his discharge summary of this August 5, 2012 hospital stay, the importance of a patient such as Ms. Demings who suffered with atrial fibrillation, to always remain on a blood-thinning medication such as Xarelto. He stated that "She is to continue with Xarelto…Instructions were given to the family to make sure that this medication is never stopped."

The staff of Garrison Nursing Home and Rehabilitation Center in Garrison, Texas failed to appreciate that Ms. Legatha Demings was at the highest risk for the development of future strokes due to her past medical history which included hypertension, atrial fibrillation, a previous TIA, and a previous stroke.

The nursing staff of Garrison Nursing Home and Rehabilitation Center obviously needed better training in safe and systematic methods to properly transfer medication orders to their MAR. Ms. Demings arrived at this nursing home in

the late evening on a Friday. The Medication Error Report indicated that the staff of this nursing home was under a short deadline to get Ms. Demings' medication orders to the pharmacy in order to obtain her medications by that evening otherwise they would not receive her medications until at least the following day or perhaps even longer since the following day fell on a weekend. It is certain that the nurse transcribing these pharmacy orders felt pressured to get this process done quickly. Unfortunately there was no procedure in place at the time of this incident to ensure that medication orders would always be accurately and precisely transcribed by the nursing staff of this facility, even under stressful situations.

After it was recognized by this nursing home staff that Ms. Demings had failed to properly receive her medications, the nursing staff of this facility recognized the need to improve their procedures for medication ordering from the pharmacy. In the Medication Error Report, the nursing staff responded to a question which asked, "What precautions can you take to prevent a similar error?" The nurse completing this report answered by stating "always have two nurses check orders on new admissions to make sure (orders are) transcribed correctly".

The specific steps of an appropriate procedure for Ms. Demings would have been tailored to her and would have been determined by an extensive assessment by the nursing staff. These measures would have included such things as having in place an appropriate plan to ensure this resident's medication orders were properly transcribed to her MAR, ensure that her medications were properly ordered and received from the pharmacy, and comparing her physician's orders with her MAR to ensure her original medication orders were always being properly carried out.

As a direct cause, this facility and its staff failed to comply with those standards set forth in paragraph numbers: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20. It is my opinion, based upon my experience, knowledge, qualifications and review of these records that these standards were not followed and the result was that Ms. Legatha Demings was harmed and injured. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, which compromised her overall health and well-being, and resulted in an overall worsening of her condition, unnecessary and preventable pain, suffering, mental anguish, and loss of dignity. These injuries and illnesses could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed.

To meet the standards, Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, and its staff were required to do among other things the following when caring for Ms. Legatha Demings:

A. Recognize and act on the fact that Ms. Legatha Demings was at high risk for illnesses due to a stroke and its related complications, by preparing and following a Care Plan based on an accurate assessment;

B. Specifically implement an effective and accurate Care Plan by ensuring:

1. That the Care Plan which included the method for safely and accurately administering Ms. Demings' medications was implemented and used at all times;

2. That Ms. Demings had sufficient and knowledgeable personnel for properly administering her medications safely;

C. Ensure that a safe and appropriate system was in place to make sure that Ms. Demings' physician orders for medications were properly and accurately transcribed and transmitted to the pharmacy;

D. Put in place a method to recheck Ms. Demings' physician mediation orders from time to time to ensure she was receiving all her necessary, prescribed medications; and

E. Inform and Educate Ms. Demings' family and/or caretakers to the risk of suffering illnesses including strokes if she did not properly receive her medications.

## SUMMARY

I have been advised that *"Negligence"* means:

*Negligence, when used with respect to the conduct of a medical facility means failure to use ordinary care, that is, failing to do that which a medical facility of ordinary prudence would have done under the same or similar circumstances or doing that which a medical facility of ordinary prudence would not have done under the same or similar circumstances.*

I have been advised *"proximate cause"* means:

> That cause which, in a natural and continuous sequence, produces an event, and without cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a health care facility, using ordinary care, would have foreseen that the event or some similar event might reasonably result there from. There may be more than one proximate cause of an event.

More likely than not, this failure on the part of Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, to practice in an acceptable manner directly resulted in Ms. Legatha Demings' illnesses due to a stroke and its complications, as well as overall worsening of her condition, unnecessary and preventable pain, suffering, extensive hospitalization, mental anguish, and loss of dignity. As more specifically set forth above, the actions and inactions of this facility caused the conditions and complications described above.

In summary, Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, did not meet the standard of care in their treatment of Ms. Legatha Demings. It is my opinion, based on my medical education, experience, and training and based upon a reasonable degree of medical and nursing, probability and certainty, that these negligent acts and omissions as stated above proximately caused Ms. Demings' illnesses due to a stroke, and their complications, along with overall worsening of condition, as well as caused her unnecessary and preventable pain, extensive hospitalization, suffering, mental anguish, and loss of dignity. It is my opinion that Garrison Nursing Home and Rehabilitation Center in Garrison, Texas, knew or should have known that their failure to meet the standards of care would put Ms. Demings at extreme risk of harm and knew or should have known that this failure to meet these standards would likely cause complications or illnesses to Ms. Demings. Nevertheless, Garrison Nursing Home and Rehabilitation Center still failed to follow the above standards. Had the standards of care been followed by Garrison Nursing Home and Rehabilitation Center, more likely than not and based upon a reasonable degree of medical and nursing, probability and certainty, Ms. Demings would not have suffered the illnesses due to a stroke, along with their complications, as well as overall worsening of her condition, unnecessary and preventable pain, suffering, extensive hospitalization, mental anguish, and loss of dignity.

Respectfully submitted,

Keith E. Miller, M.D.
620 Tenaha Street
Center, Texas   75935

# CURRICULUM VITAE

## KEITH E. MILLER, M.D.

620 Tenaha Street

Center, Texas   75935

(936) 598-2716

# KEITH E. MILLER, M.D.

## - EDUCATION -

Chief Resident, 7/87 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Residency, 7/86 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Internship, 7/85 to 6/86
University Hospital
Little Rock, Arkansas

Doctor of Medicine Degree, 8/81 to 5/85
University of Arkansas College of Medicine
Little Rock, Arkansas

Attended, 8/80 to 5/81
University of Arkansas at Little Rock, School of Law
Little Rock, Arkansas

Bachelor of Arts, 8/76 to 5/79
German and Chemistry
Baylor of University
Waco, Texas

Attended, 8/75 to 5/76
Biology and Chemistry
East Texas Baptist College
Marshall, Texas

Shelbyville High School, 8/71 to 5/75
Shelbyville, Texas

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES-

Full Time Family Medicine Practice, July 1988 to Present

Commissioner, 9/03 to 9/07
Texas State Board of Medical Examiners / Texas Medical Board
State Medical Licensing Board of Texas

Physician Consultant for Physician Peer Review, 8/90 to 9/03
Texas State Board of Medical Examiners
State Medical Licensing Board of Texas

Member, Texas Statewide Medical Advisory Committee, 8/95 to Present
Blue Cross/Blue Shield of Texas
Performs Physician Peer Review for All Blue Cross/Blue Shield Patients in Texas

President, 1990 to Present
Shelby County Medical Society

Advisory Committee Member and Clinical Faculty, 8/90 to Present
School of Licensed Vocational Nursing
Panola College
Center, Texas

Member, Board of Directors, and Medical Director, 8/90 to Present
Shelby County Child Advocacy Center
Center, Texas

2014 to Present
Family Medicine Service Privileges
Memorial Hospital San Augustine
San Augustine, Texas

2014 to Present
Family Medicine Service Privileges
Nacogdoches Medical Center
Nacogdoches, Texas

Former Physician Reviewer, Texas Medical Foundation, 8/90 to 8/03
Performs Physician Peer Review/Quality Assurance for
All Medicare and Champus Patients in Texas

3

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES (CONTINUED)-

Former Clinical Faculty, Preceptor, 8/90 to 8/03
University of Texas Health Sciences Center
Family Practice Residency Program
Tyler, Texas

Former Director of Emergency Services, 8/90 to 8/11
Shelby Regional Medical Center
Center, Texas

Former Chief of Staff
Shelby Regional Medical Center
Center, Texas

July 1988 to 2013
Full Time Active Family Practice Privileges
Shelby Regional Medical Center
Center, Texas

September 2010 to Present
Medical Director
Legacy Hospice of Center
Center, Texas

March 2011 to Present
Assistant Medical Director
The Hospice of East Texas
Tyler, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Holiday Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Pine Grove Nursing Home
Center, Texas

4

## -PRACTICE ACTIVITIES (CONTINUED)-

July 1988 to Present
Full Time Active Family Practice Privileges
Green Acres Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Twin Lakes Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Colonial Pines Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Trinity Nursing and Rehabilitation Center
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
El Camino House Nursing Home
San Augustine, Texas

December 2013 to Present
Full Time Active Family Practice Privileges
Lakeside Village Assisted Living
Center, Texas

March 2012 to Present
Medical Director
Bethany Home Health Care Agency
Carthage, Texas

January 2014 to May 2015
Medical Director, Jennings Place
Day Care for Mentally Challenged Adults
Center, Texas

5

# KEITH E. MILLER, M.D.

## - BOARD CERTIFICATIONS -

American Board of Family Medicine, ID 53861

Certification Date July 8, 1988

Re-Certification Date July 14, 1995

Re-Certification Date July 12, 2002

Re-Certification Date July 15, 2010

## - PROFESSIONAL CERTIFICATIONS -

Hospice Medical Director Certified (HMDC)
Hospice Medical Director Certification Board
July 8, 2014 to Present

Certified Medical Review Officer
Medical Review Officer Certification Council
United States Department of Transportation
United States Department of Health and Human Services
Certified February 21, 2006
Re-certified March 24, 2012

Certified Medical Examiner
Federal Motor Carrier Safety Administration
United States Department of Transportation
United States Department of Health and Human Services
Certified February 11, 2014

Fellow (AAFP), 1990 to Present
American Academy of Family Physicians

American Heart Association
CPR Instructor
Advanced Cardiac Life Support Instructor
Pediatric Advanced Life Support Provider

# KEITH E. MILLER, M.D.

## - PROFESSIONAL AFFILIATIONS -

American Medical Association

Southern Medical Association

American Academy of Family Physicians

Texas Medical Association

Shelby County Medical Society

## - VOLUNTEER ACTIVITIES -

Texas State Legislature
Physician of the Day, 1989 to Present

Coordinator, Free Physicals Programs, 1988 to Present
Department of Athletics
Center Independent School District, Center, Texas

Team Physician, 1988 to Present
Department of Athletics
Center Independent School District

Vice-President, Board of Trustees, 1990 to 1999
Center Independent School District, Center, Texas

Preceptor, 1990 to Present
Texas Statewide Medical Student Preceptorship Program

Member, Development Council
Baylor University

Former Member, Committee on Rural Health Concerns
Texas Medical Association

Former Member, Committee on Rural Health
Texas Academy of Family Physicians

7

# KEITH E. MILLER, M.D.

## -LICENSURE-

State of Texas (H-2155), 8/87 to Present

Formerly Licensed in Arkansas and Louisiana

## - AWARDS -

Texas Academy of Physician Assistants
Supervising Physician of the Year - 2004

American Medical Association
Physician's Recognition Award

American Academy of Family Physicians
Award for Clinical Instruction of Medical Students

Center Independent School District
Community Service Award for Contributions to
Student Academics and Athletics

Anderson County Educational Cooperative
Service Award for Organizing Programs for
Special Services Students

Texas State Legislature
Award of Appreciation for Serving as
Physician to Legislators While in Session

## - PUBLICATIONS -

"Use of Digoxin in the Family Practice Setting"
*Journal of the Arkansas Medical Society*
February 1988

8

# KEITH E. MILLER, M.D.

## - ARTICLES -

"More Doctors in Texas After Malpractice Caps"
*New York Times*
October 5, 2007
Story of Texas Medical Board Responding to Increased Licensing
Demands During My Tenure as Chairman of the Licensing Committee

"Dangerous Doctors"
*Reader's Digest*
June 2004
Background Story of Texas Medical Board Prior to My
Appointment as a Commissioner

"Dangerous Doctors – Follow-Up"
*Reader's Digest*
March 2005
Follow-up Story of Texas Medical Board After My
Appointment as a Commissioner Including Motion Made by Myself for the Largest Fine
Levied Against a Doctor by any State in History

"No Medicinal Jet Fuel"
*Texas Medicine*
August 2009
Story of My Filing of Complaint Against a Physician for Non-Therapeutic Prescribing

## - PERSONAL -

Married to Linda Gee Miller since 1975

Interests Are Health-Care Reform and Finance Issues, in America and Abroad

Speaks Fluent German and Passable Spanish

Instrument-Rated Private Aircraft Pilot

Umpire, High School Baseball

9

# Appendix C

461 S.W.3d 140
Supreme Court of Texas.

Melissa Van Ness, Individually and as Next
Friend, an Heir at Law, and a Surviving Parent of
Nicholas Van Ness, Ronald Van Ness, Individually
and as Next Friend, an Heir at Law, and a
Surviving Parent of Nicholas Van Ness, and Estate
of Nicholas Van Ness, Petitioners,
v.
ETMC First Physicians & Kristin Ault, D.O.,
Respondents

No. 14–0353 | Opinion delivered: April 24, 2015

**Synopsis**
**Background:** Parents of minor child who died of
pertussis (whooping cough) brought a health care liability
action against physician and physician's employer. The
2nd Judicial District Court, Cherokee County, denied
physician and employer's motion to dismiss based on
parents' alleged failure to comply with requirements for
an expert report. Physician and employer appealed. The
Tyler Court of Appeals, 2014 WL 1308624, reversed,
rendered, and remanded. Parents petitioned for review.

[Holding:] The Supreme Court held that the trial court
acted within its discretion in determining that expert's
report was a good-faith effort to comply with the statutory
requirements for expert reports in health care liability
cases.

Petition for review granted; judgment of Court of Appeals
reversed and case remanded.

West Headnotes (6)

[1]    **Health**
       Affidavits of merit or meritorious defense;
       expert affidavits

       A report is a good-faith effort to comply with
       the statutory requirements for expert reports in
       health care liability cases, so as to survive a
       challenge to the sufficiency of the report, if it

provides adequate information to inform the
defendant of the specific conduct the plaintiff
has called into question, provides a basis for the
trial court to conclude that the claims have
merit, and does not contain a material
deficiency. Tex. Civ. Prac. & Rem. Code Ann.
§§ 74.351(l), (r)(6).

2 Cases that cite this headnote

[2]    **Appeal and Error**
       Rulings on admissibility of evidence in
       general

       A trial court's ruling on the sufficiency of an
       expert's report in a health care liability case is
       reviewed for abuse of discretion. Tex. Civ. Prac.
       & Rem. Code Ann. §§ 74.351(l), (r)(6).

       Cases that cite this headnote

[3]    **Appeal and Error**
       Cases Triable in Appellate Court
       **Appeal and Error**
       Sufficiency of Evidence in Support

       When reviewing for abuse of discretion,
       appellate courts defer to the trial court's factual
       determinations if they are supported by evidence
       but review its legal determinations de novo.

       1 Cases that cite this headnote

[4]    **Appeal and Error**
       Abuse of discretion

       A trial court abuses its discretion if it rules
       without reference to guiding rules or principles.

       1 Cases that cite this headnote

[5]    **Health**
       Affidavits of merit or meritorious defense;
       expert affidavits

       For an expert's report in a health care liability
       case to be sufficient, the expert must explain,
       based on facts set out in the report, how and why
       the breach caused the injury; a bare opinion that
       the breach caused the injury will not suffice.
       Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351(l),
       (r)(6).

       2 Cases that cite this headnote

[6]    **Health**
       Affidavits of merit or meritorious defense;
       expert affidavits

       Trial court acted within its discretion in
       determining that expert's report was not
       conclusory but, instead, was a good-faith effort
       to comply with the statutory requirements for
       expert reports in health care liability cases, such
       that parents' action against physician and
       physician's employer after minor child died of
       pertussis (whooping cough) survived a motion
       to dismiss for failure to comply with the
       requirements, even though the report contained
       conflicting statements regarding antibiotics and
       causation; the report also set out that child's
       illness was treatable when physician saw him
       and that starting antibiotics at that time and
       continuing them as indicated by diagnostic
       testing probably would have prevented child's
       death. Tex. Civ. Prac. & Rem. Code Ann. §§
       74.351(l), (r)(6).

       1 Cases that cite this headnote

*141 ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH
DISTRICT OF TEXAS

**Attorneys and Law Firms**

Heidi O. Vicknair, Jason Charles Webster, Houston, Tina
Brumbelow, Tyler, Vincent L. Marable III, Paul Webb,
P.C., Wharton, for Petitioners Estate of Nicholas Van
Ness, Melissa Van Ness, Ronald Van Ness, individually
and as next friend, heirs at law, and surviving parents of
Nicholas Van Ness.

Russell G. Thornton, Thiebaud Remington Thornton
Bailey LLP, Dallas, for Respondents Kristin Ault, D.O.,
ETMC First Physicians.

**Opinion**

PER CURIAM

**\*\*1** This case, which is subject to the Texas Medical
Liability Act (TMLA), TEX. CIV. PRAC. & REM.
CODE ch. 74, involves the adequacy of an expert report.
The issue is whether the trial court abused its discretion
by denying the defendants' motion to dismiss in light of
conflicting statements in the plaintiffs' expert report,
some of which the defendants alleged, and the court of
appeals held, failed to link the expert's conclusions to the
underlying facts.

Nicholas Van Ness died from pertussis (whooping cough)
when he was two months old. His parents, Melissa and
Ronald Van Ness, sued Kristin Ault, D.O., and her
employer, ETMC First Physicians, alleging that Dr.
Ault's negligence caused Nicholas's death and that
ETMC was vicariously liable for her negligence. The Van
Nesses timely served Dr. Ault and ETMC with an expert
report by Alvin Jaffee, M.D., then served an amended
report after the trial court sustained the defendants'
objections to the original. The defendants again moved to
dismiss the suit, contending that Dr. Jaffee's opinions as
to causation were conclusory because the amended report
(the report) failed to link his opinions to the underlying
facts. The trial court denied the motion. On interlocutory
appeal, *see* TEX. CIV. PRAC. & REM. CODE §
51.014(a)(10), the court of appeals reversed and ordered
the suit dismissed. *ETMC First Physicians v. Van Ness,*
461 S.W.3d 152 (Tex.App.–Tyler 2014). We reverse the
judgment of the court of appeals.

[1] A plaintiff asserting a health care liability claim must
serve each defendant with an expert report that includes
"a fair summary of the expert's opinions ... regarding
applicable standards of care, the manner in which the care
rendered by the physician or health care provider failed to
meet the standards, and the causal relationship between
that failure and the injury, harm, or damage claimed."
TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). A
challenge to the sufficiency of a report must be sustained

if "the report does not represent an objective good faith effort to comply with the [statutory requirements]." *Id.* § 74.351(l). A report is a good faith effort if it provides adequate information to "inform the defendant of the specific conduct the plaintiff has called into question, ... provide[s] a basis for the trial court to conclude that the claims have merit,"*Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam), and "does not contain *142 a material deficiency,"*Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex.2011).

[2] [3] [4] [5]A trial court's ruling on the sufficiency of an expert's report is reviewed for abuse of discretion. *Rosemond v. Al–Lahiq,* 331 S.W.3d 764, 766 (Tex.2011); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). Under that standard, appellate courts defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo. *See Stockton v. Offenbach,* 336 S.W.3d 610, 615 (Tex.2011). A trial court abuses its discretion if it rules without reference to guiding rules or principles. *Samlowski,* 332 S.W.3d at 410. An expert must explain, based on facts set out in the report, how and why the breach caused the injury. *See Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex.2010). A bare expert opinion that the breach caused the injury will not suffice. *Id.*

**2 Dr. Jaffee set out the following facts in his report as those on which he based his opinions. Nicholas was born on November 13, 2009. He was seen by Dr. Ault on November 19 and November 30 for regular checkups, and Dr. Ault noted no concerns at either visit. However, the records from his four-week checkup on December 11 reflected that Nicholas had a fever with a temperature of 100.2 degrees, was coughing and suffering from nasal congestion, and was exposed to "sick contacts at home." According to an affidavit submitted by Nicholas's mother, she reported to Dr. Ault on December 11 that Nicholas had been coughing to the point that he could not breathe and was exhibiting facial discoloration. Nothing indicated that Dr. Ault performed any laboratory or diagnostic tests on Nicholas.

The Van Nesses returned to see Dr. Ault on December 15 and explained that Nicholas's symptoms had worsened. Dr. Ault physically examined Nicholas, but again did not perform or order any tests. On December 20, the Van Nesses took Nicholas to East Texas Medical Center Hospital in Jacksonville, where he was treated for acute pneumonia, wheezing, and tachycardia. The following day he was transferred to the Children's Medical Center Hospital in Dallas, where he died on January 20, 2010.

The defendants objected to Dr. Jaffee's report on the ground that it failed to explain how Dr. Ault's alleged negligence caused Nicholas's death, specifically contending that Dr. Jaffee's medical conclusion was not linked to the facts of the case and was conclusory. The defendants moved for dismissal of the suit. The trial court denied the motion. The court of appeals reversed and rendered judgment dismissing the Van Nesses' suit with prejudice, agreeing with the defendants that Dr. Jaffee's report was deficient as to the causation element. 461 S.W.3d at 143

[6]Dr. Jaffee's nine-page report generally discusses pertussis, including its diagnosis and treatment. His report also contains separate sections addressing the applicable standard of care, breach of the standard, and causation. In the standard of care section, he opined, in part, that

> [t]he applicable standard of care as to Kristin Ault, DO is upon evaluation of a one month old child who presents with symptoms such as a history of fever, cough and nasal congestion, compounded by sick contacts at home, is to perform laboratory tests, administer antibiotics prophylactically while the tests are pending and/or to admit the infant to a medical facility....

> ....

> ... [H]ad Dr. Ault, performed any of these tests, it would have shown *Bordetella pertussis* at a treatable stage and but for the failure to treat Nicholas Van *143 Ness as outlined above he would have had a 51% or more chance of survival.

In the breach section, Dr. Jaffee states again that Dr. Ault breached the standard of care in several ways on both December 11 and December 15, including failing to have various laboratory diagnostic tests performed on Nicholas and failing to administer antibiotics prophylactically while the tests were performed. Finally, in the causation section of his report, Dr. Jaffee repeats his opinion that Dr. Ault should have taken specified actions including running diagnostic tests on Nicholas and administering antibiotics prophylactically. He also states, "It is within a reasonable degree of medical certainty and/or with 51% certainty that had Dr. Ault appropriately evaluated and diagnosed him, Nicholas Van Ness would have received the appropriate dosage and treatment of antibiotics in a timely manner, and he would not have expired on January 20, 2010."

As support for its conclusion that the report was deficient as to causation, the appeals court focused on several statements from the report, including the following:

• "prevention of pertussis via vaccination is of primary importance because treatment is of little benefit to the person infected";

**3 • "unvaccinated or incompletely vaccinated infants younger than 12 months of age have the highest risk for severe and life-threatening complications and death";

• "A reasonable guideline is to treat ... infants aged less than [one] year within six weeks of cough onset"; and

• "antibiotics may 'shorten the duration of infectiousness and are thus recommended.' "

461 S.W.3d 152.

In reaching its conclusion as to Dr. Jaffee's report, the court of appeals noted that Nicholas began receiving treatment on December 20 in the Jacksonville hospital. It further identified December 20 as being approximately three weeks after Nicholas's visit with Dr. Ault on November 30, at which time he was not yet feverish, coughing, or presenting other symptoms. Given the temporal sequence of events, the appeals court reasoned that treatment beginning on December 20 "was well within the reasonable guideline of treating the disease within six weeks of cough onset" specified by Dr. Jaffee and

Dr. Jaffee's conclusion that Nicholas would not have died had Dr. Ault began treatment on December 11, 2010, or December 15, 2010, does not follow from the aforementioned discussion of the facts in his report.

Rather, because treatment is of little benefit to the person affected, the facts lead to the conclusion that had Dr. Ault provided antibiotics to Nicholas on either of those dates, at most Nicholas's symptoms may have lessened and his ability to spread the disease to others may have diminished. The facts discussed in the report do not show that treatment would have altered the course of the disease, but lead to the conclusion that Nicholas was unfortunately one of those infants who did not survive despite timely treatment.

461 S.W.3d at 144.

The court of appeals focused on Dr. Jaffee's statements that treatment with antibiotics is of little benefit and only would have lessened Nicholas's symptoms and reduced the contagiousness of his pertussis. 461 S.W.3d 152. Based on those statements, the court concluded that the report showed that treatment earlier than December 20

would not have prevented Nicholas's death; thus, the report did not *144 demonstrate a causal relationship between Dr. Ault's alleged negligence and Nicholas's death. 461 S.W.3d 152.

In its analysis however, the appeals court did not fully credit all of Dr. Jaffee's factual statements and opinions. In particular, the court did not credit statements and opinions from Dr. Jaffee's report to the effect that (1) a stage existed at which pertussis could be treated with antibiotics; (2) if Dr. Ault had given Nicholas antibiotics prophylactically and ordered testing, the tests would have shown his pertussis was at a treatable stage; and (3) Nicholas would have had a 51% chance of recovery if Dr. Ault had started Nicholas on prophylactic antibiotics and continued antibiotics as indicated by results of the tests.

Dr. Jaffee's statement about antibiotics having little effect on pertussis other than reducing the potential for spreading the disease is in tension with his statements that Nicholas was treatable with antibiotics and would have had a 51% chance of survival if Dr. Ault had administered them. The first-referenced statement, by itself, indicates that whatever Dr. Ault did on December 11 or December 15 would have had little effect on the course of Nicholas's illness and would not have prevented his death. Accordingly, as the court of appeals explained, that statement standing alone would not demonstrate that under the facts as set out in the report Dr. Ault's alleged negligence was causally related to Nicholas's death, and his causation opinion would be conclusory.

**4 However, Dr. Jaffee's report also set out that Nicholas's illness was treatable when Dr. Ault saw him in December, and starting antibiotics at that time and continuing them as indicated by diagnostic testing probably would have prevented Nicholas's death. Given these parts of the report, the trial court could have determined that Dr. Jaffee's opinions were linked to the underlying facts and explained why and how Dr. Ault's timely treatment of Nicholas with antibiotics would have prevented his death.

Under the circumstances, the trial court had discretion—indeed it was incumbent on the trial court—to review the report, sort out its contents, resolve any inconsistencies in it, and decide whether the report demonstrated a good faith effort to show that the Van Nesses' claims had merit. Considering both the report's explication of how Dr. Ault's alleged negligence was causally related to Nicholas's death and the conflicting statements as to that causal relationship, we conclude that the trial court did not abuse its discretion by determining that the report was not conclusory, but was a good faith

effort to comply with the TMLA's requirements. Thus the trial court did not abuse its discretion by denying Dr. Ault's motion to dismiss, *see Samlowski,* 332 S.W.3d at 410, and the court of appeals erred by reversing the trial court's judgment.

We grant the petition for review. Without hearing oral argument, *see*TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

**All Citations**

461 S.W.3d 140, 2015 WL 1870051, 58 Tex. Sup. Ct. J. 746

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix D



'8 S.W.3d 552, 556
The phrases 'stan-
f' are not synony-
lpractice actions.
: expert's medical
ne applicable stan-
s not constitute a
§74.351(r)(6). In-
ndard of proof re-
cases. In the ab-
any expert report
or health care
nd wanton could
ose dixit because
n expert report is

**TRUCTIONS**
**MERGENCY**
**E**

t involves a claim
ion of emergency
department or ob-
imediately follow-
batient in a hospi-
shall instruct the
her relevant mat-

ig care did or did
or was able or un-
ry, including the
ditions, allergies,

xisting physician-
ovider-patient re-

ig the emergency;

ng the delivery of

(a) do not apply

; stabilized and is
nt as a nonemer-

al medical emer-

---

(3) that is related to an emergency caused in whole or in part by the negligence of the defendant.

History of CPRC §74.154: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003.

See also *O'Connor's Texas COA*, "Medical Negligence Under the Medical Liability Act," ch. 20-A, p. 599.

*Sections 74.155-74.200 reserved for expansion*

### SUBCHAPTER E. RES IPSA LOQUITUR

### CPRC §74.201. APPLICATION OF RES IPSA LOQUITUR

The common law doctrine of res ipsa loquitur shall only apply to health care liability claims against health care providers or physicians in those cases to which it has been applied by the appellate courts of this state as of August 29, 1977.

History of CPRC §74.201: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003. Source: TRCS art. 4590i, §7.01.

See also *O'Connor's Texas COA*, "Res ipsa loquitur," ch. 20-A, §9.3, p. 668.

#### ANNOTATIONS

*Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 751 (Tex.App.—Houston [14th Dist.] 2011, no pet.). "*Res ipsa loquitur* is not a cause of action separate from negligence; rather, it is a rule of evidence by which the jury may infer negligence. It applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. Further, the doctrine applies only when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laypersons, requiring no expert testimony. ... The three recognized areas in which *res ipsa loquitur* applies to health care claims are negligence in the use of mechanical instruments, operating on the wrong body part, and leaving surgical instruments or sponges inside the body." See also *Haddock v. Arnspiger*, 793 S.W.2d 948, 951 (Tex.1990); *Broxterman v. Carson*, 309 S.W.3d 154, 158-59 (Tex.App.—Dallas 2010, pet. denied).

*Traut v. Beaty*, 75 S.W.3d 661, 667 (Tex.App.—Texarkana 2002, no pet.). "[*R*]es ipsa loquitur cannot be applied in every case in which an object is left in a patient's body." Held: Although P used the theory of res ipsa loquitur, expert testimony was needed to establish a causal connection between D's negligence and P's pain.

*Sections 74.202-74.250 reserved for expansion*

---

### SUBCHAPTER F. STATUTE OF LIMITATIONS

### CPRC §74.251. STATUTE OF LIMITATIONS ON HEALTH CARE LIABILITY CLAIMS

(a) Notwithstanding any other law and subject to Subsection (b), no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed; provided that, minors under the age of 12 years shall have until their 14th birthday in which to file, or have filed on their behalf, the claim.[1] Except as herein provided this section applies to all persons regardless of minority or other legal disability.

(b) A claimant must bring a health care liability claim not later than 10 years after the date of the act or omission that gives rise to the claim. This subsection is intended as a statute of repose so that all claims must be brought within 10 years or they are time barred.

1. Editor's note: A minor is not legally capable of bringing suit until she reaches the age of 18. *Weiner v. Wasson*, 900 S.W.2d 316, 318 (Tex.1995). Thus, a minor has until her 20th birthday to file suit. *Id.* at 321; *see also Adams v. Gottwald*, 179 S.W.3d 101, 103 (Tex.App.—San Antonio 2005, pet. denied) (applying open-courts provision of Texas Constitution to §74.251).

History of CPRC §74.251: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003. Source: TRCS art. 4590i, §10.01.

See also *O'Connor's Texas COA*, "Limitations," ch. 20-A, §5, p. 637.

#### ANNOTATIONS

#### *Generally*

*Methodist Healthcare Sys. v. Rankin*, 307 S.W.3d 283, 290 (Tex.2010). "To hold that a statute of repose [like §74.251(b)] must yield to [P's] inability to discover her injury would treat a statute of repose like a statute of limitations, and would effectively repeal this and all other statutes of repose. *At 292:* Section 74.251(b)'s grant of absolute protection against indefinite potential liability does not violate the Texas Constitution." See also *Walters v. Cleveland Reg'l Med. Ctr.*, 307 S.W.3d 292, 298 (Tex.2010).

*Shah v. Moss*, 67 S.W.3d 836, 841 (Tex.2001). TRCS art. 4590i, §10.01, now CPRC §74.251(a), "measures the limitations period for medical negligence claims from one of three dates: (1) the occurrence of the breach or tort, (2) the last date of the relevant course of treatment, or (3) the last date of the relevant hospitalization. A plaintiff may not choose the most favorable date that falls within §10.01's three categories. Rather,



time at which damages subject to such limits are awarded by final judgment or settlement.

(c) Subsection (a) does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

(d) The liability of any insurer under the common law theory of recovery commonly known in Texas as the "Stowers Doctrine" shall not exceed the liability of the insured.

(e) In any action on a health care liability claim that is tried by a jury in any court in this state, the following shall be included in the court's written instructions to the jurors:

(1) "Do not consider, discuss, nor speculate whether or not liability, if any, on the part of any party is or is not subject to any limit under applicable law."

(2) "A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence."

History of CPRC §74.303: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003. Source: TRCS art. 4590i, §11.04.

See also *O'Connor's Texas COA*, "*Stowers* Doctrine," ch. 13-E, p. 367; "Medical Negligence Under the Medical Liability Act," ch. 20-A, p. 599.

### ANNOTATIONS

***Phillips v. Bramlett***, 288 S.W.3d 876, 880 n.5 (Tex. 2009). "The [MLIIA], [TRCS] art. 4590i ..., was repealed.... The cap in [TRCS art. 4590i,] §11.02 was, however, carried forward in [CPRC] §74.303(a).... The *Stowers* exception in §11.02(c) was not carried forward, but rather replaced by §74.303(d) which expressly provides that the insurer can now use the cap to limit its liability...."

*Sections 74.304-74.350 reserved for expansion*

### SUBCHAPTER H. PROCEDURAL PROVISIONS

### CPRC §74.351. EXPERT REPORT

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

(d) to (h) [Reserved.]

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.



**(k)** Subject to Subsection (t), an expert report served under this section:

(1) is not admissible in evidence by any party;

(2) shall not be used in a deposition, trial, or other proceeding; and

(3) shall not be referred to by any party during the course of the action for any purpose.

**(l)** A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

**(m) to (q)** [Reserved.]

**(r)** In this section:

(1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2) "Claim" means a health care liability claim.

(3) [Reserved.]

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

(D) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

(E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

**(s)** Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

(1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

**(t)** If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

**(u)** Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

History of CPRC §74.351: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003. Amended by Acts 2005, 79th Leg., ch. 635, §1, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., ch. 870, §2, eff. Sept. 1, 2013. Source: TRCS art. 4590i, §13.01.

See also *O'Connor's Texas COA*, "Expert report," ch. 20-A, §7.2, p. 652.

### ANNOTATIONS

### §74.351(a)

***Zanchi v. Lane***, 408 S.W.3d 373, 375 (Tex.2013). "Today we determine whether a claimant asserting [an HCLC] complies with [CPRC] §74.351(a)'s mandate to

expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case. Indeed, if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. However, the proffered medical expert's expertise must be evident from the four corners of his report and curriculum vitae." *See also Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 198 (Tex.App.—Houston [14th Dist.] 2009, no pet.).

*Packard v. Guerra*, 252 S.W.3d 511, 531-32 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Corporate attorney's expert "report explaining the 'contractual and corporate inter-relationships of the various [Ds]' along with their duties to each other [is admissible because CPRC] §§74.401(d) and 74.402(d) are available for use at the expert report phase of [an HCLC]."

*Group v. Vicento*, 164 S.W.3d 724, 731 (Tex.App.—Houston [14th Dist.] 2005, pet. denied). "[S]ection 74.402(a)'s two definitions of 'practicing health care' are not exclusive. [¶] Reading §74.402 subsections (a) and (b)(1) together, subsection (a) expands upon the definition of 'practicing health care' to *include* qualified teachers and consulting health care providers who may not otherwise be qualified under subsection (b)(1) because they are not *practicing* health care and instead teach or consult." *See also Foster v. Zavala*, 214 S.W.3d 106, 113 (Tex.App.—Eastland 2006, pet. denied).

## CPRC §74.403. QUALIFICATIONS OF EXPERT WITNESS ON CAUSATION IN HEALTH CARE LIABILITY CLAIM

(a) Except as provided by Subsections (b) and (c), in a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(b) In a suit involving a health care liability claim against a dentist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care

and the injury, harm, or damages claimed if the person is a dentist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(c) In a suit involving a health care liability claim against a podiatrist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed if the person is a podiatrist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(d) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

History of CPRC §74.403: Acts 2003, 78th Leg., ch. 204, §10.01, eff. Sept. 1, 2003.

See also *O'Connor's Texas COA*, "Expert Testimony," ch. 20-A, §8, p. 661.

### ANNOTATIONS

*TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 111 (Tex. App.—Fort Worth 2011, no pet.). "[P] argues that an expert report [on a claim for the wrongful release of medical information prohibited by Occ. Code §159.002] would require the expert to render a legal opinion and, because the statute requires a physician to render the expert opinion, it cannot be created. *At 114:* Because the standard of care regarding confidentiality is a standard that applies to all health care providers and because health care providers are expected to know the